Present:  Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and
Kinser, JJ., and Compton, Senior Justice

MARK WESLEY BAILEY

OPINION BY
v.  Record Nos. 992840,          JUSTICE LAWRENCE L. KOONTZ, JR.
            000151                      April 21, 2000

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Walter J. Ford, Judge


As mandated by Code § 17.1-313, we review the convictions

and death sentences imposed upon Mark Wesley Bailey (Bailey),

for the capital murder of Nathan Mark Bailey (Nathan), Bailey's

two-year-old son.  We also review Bailey's convictions for the

first-degree murder of Katherine Ester Bailey (Katherine),

Bailey's wife, and use of a firearm in the commission of capital

murder and first-degree murder.[1]

_____

[1]By order entered January 27, 2000, we certified from the
Court of Appeals of Virginia to this Court the record of
Bailey's appeal of the noncapital convictions (Record No.
000151).  The effect of the certification is to transfer
jurisdiction over the noncapital appeal to this Court.  Code
§ 17.1-409(A).  Because the certification occurred after the
filing of the opening brief in the capital appeal (Record No.
992840), we permitted Bailey to file a supplemental brief based
upon the petition for appeal he had filed in the Court of
Appeals.  Only the first of Bailey's assignments of error in the
supplemental brief raises an issue not already raised in the
capital appeal.  The remaining assignments of error in the
supplemental brief, numbers 2, 3, and 4, correspond to
assignments of error numbers 10, 11, and 12 in the capital
appeal.  Accordingly, we will address those issues in this
opinion with reference to the latter designations.

BACKGROUND

Under familiar principles of appellate review, we will review the evidence in the light most favorable to the Commonwealth, the party prevailing below. Clagett v. Commonwealth, 252 Va. 79, 84, 472 S.E.2d 263, 265 (1996), cert. denied, 519 U.S. 1122 (1997). In his opening brief, Bailey recounts a self-serving narrative of his wife's infidelity which he contends drove him to commit these crimes. The facts underlying this narrative were developed during the penalty-determination phase of Bailey's trial as evidence in mitigation against the death penalty. The prurient details of this evidence are not relevant to any issue to be considered in these appeals other than the appropriateness of the imposition of the death penalty. Accordingly, we will limit our present recitation of the facts to those relevant to our consideration of Bailey's assignments of error.

Bailey was married to Katherine, his cousin whom he had known most of his life and with whom he had been romantically involved for over a year, on December 25, 1993 in Reno, Nevada. In March 1996, Katherine gave birth to the couple's son, Nathan. After the birth of their son, the couple became emotionally estranged, although they continued living in the same household.

In mid-1998, Bailey began relating to his co-workers a fabricated account of his wife having received threatening telephone calls and notes. Bailey subsequently admitted to police that he invented these stories in order to divert suspicion from himself when he murdered his wife. In August 1998, Bailey borrowed a .22-caliber pistol from a friend and purchased ammunition for the pistol.

On September 10, 1998, Bailey awoke about 4:30 a.m., went to the bedroom where his wife was sleeping, and shot her three times in the head with the borrowed pistol. Bailey then heard Nathan awaking in the next bedroom. He went to his son's bedroom and shot the child twice in the head as the child was climbing out of bed.

Bailey washed blood off his face and dressed for work. He cut the bathroom window screen with a razor knife and cut the outside telephone line in order to give the appearance that a break-in had occurred. Bailey then left for work, taking the pistol and razor knife with him.

When Bailey arrived at work, he told Richard Moravec, his supervisor, that his wife had received another threatening note that read "X-U-T" or "X-U-P" and that he believed this meant "Time's up." Bailey repeated this story to Joseph Yount, Moravec's supervisor. A short time later, Bailey told Moravec

3

that he had received a telephone call from someone claiming that he "had [Bailey's] wife." Moravec reported these events to Yount, who instructed Moravec to call the police. Yount then accompanied Bailey to Bailey's home.

When Yount and Bailey arrived at Bailey's home, police had already arrived and an officer emerging from one of the bedrooms stopped the two men in the living room. Yount suggested that they wait outside. Yount later testified that as they waited Bailey "was stone-faced and cold-looking." Thomas Killilea, a detective with the Hampton Police Department, informed Bailey that his wife and son were dead. Killilea testified that upon hearing this, Bailey lurched forward and appeared to have tears in his eyes. Bailey then told Killilea about the threatening telephone calls and notes that he claimed his wife had received.

Killilea asked Bailey to accompany him to the police station and Bailey agreed. Bailey rode in the front of Killilea's police vehicle; Yount rode in the back seat. Bailey was not under arrest at this time. At the police station, Bailey signed a consent form allowing the police to search his home; he also consented to take a polygraph test. While at the police station, Bailey was offered food, drink, and the opportunity to use the lavatory. He engaged the police officers in casual conversation and was allowed to step outside to smoke

4

cigarettes.  During this time, Bailey wrote a statement detailing the fictitious story of the threats made against his wife.

The polygraph was administered to Bailey at 12:15 p.m. During the polygraph, the examiner detected deception in Bailey's response to the question, "Are you intentionally withholding the name of the killer . . .?"  The examiner asked Bailey if he thought it was time to tell the detectives "what was really going on."  Bailey looked at the floor and answered, "[Y]eah."

At 1:42 p.m., Bailey was taken to an interview room where Killilea and Detective Jimmy L. Forbes spoke to him for a little over an hour.  Bailey was mostly unresponsive during this interview.  Forbes raised the subject of his own religious beliefs.  He suggested that Bailey needed to get his "heart right with the Lord and that his soul would not rest until he did."  Bailey asked for a soft drink.  When Killilea left the room to get the soft drink, Bailey took a legal pad and pen from the table in the interview room and wrote, "I Mark Bailey do hereby without any coercsion [*sic*] admit to the murder of my wife and son."

When Killilea returned with the soft drink, Forbes showed him the statement Bailey had written.  Bailey then said, "You

5

got what you wanted. I guess I'm not leaving now." At 3:19 p.m., Bailey was advised of his Miranda rights, and the detectives began an interrogation that lasted until 5:45 p.m. During this period Bailey wrote out answers to the detectives' questions and a videotape of his confession to the murders was made.

During his stay at the police station Bailey never asked to leave, nor did he request an attorney. At the conclusion of the interrogation, Bailey remarked to Killilea, "You probably think I'm an [expletive deleted] for killing my wife and family - - or my wife and son." The detective explained that if he had thought that he would not have treated Bailey with dignity and respect. Bailey agreed he had been "treated well."

PROCEEDINGS

A. Pre-trial

On December 7, 1998, the grand jury of the City of Hampton returned an indictment against Bailey charging him with the capital murder of Nathan as part of the same act or transaction as the killing of Katherine, Code § 18.2-31(7), "and/or" as the killing of a person under the age of fourteen by a person twenty-one years of age or older, Code § 18.2-31(12). In separate indictments, Bailey was also charged with the first-degree murder of Katherine, Code § 18.2-32, and with one count

6

of the use of a firearm in each of the two killings, Code § 18.2-53.1.

On January 12, 1999, Bailey filed a motion for the appointment of an "expert investigator." Bailey contended that he needed the assistance of an investigator to "locate essential witnesses and data, [and] examine and evaluate testimony and documents . . . likely to be significant at a capital murder trial." By order entered that same day, the trial court denied the motion, finding there was no "sufficient reasonable cause for an investigator to be assigned to the defense in this case."

On February 9, 1999, Bailey filed a motion to have the Virginia capital murder and death penalty statutes declared unconstitutional. Within a supporting memorandum filed with that motion, Bailey set out various arguments that the manner in which capital murder trials are conducted and death sentences reviewed on appeal violated aspects of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Since Bailey challenges the denial of his motion by the trial court in this appeal, we need not recite those arguments here, but will address them in our discussion of Bailey's assignments of error.

On that same day, Bailey filed a motion for discovery and inspection. Within that motion, Bailey made a litany of

7

requests for information from the Commonwealth, which, as his counsel subsequently conceded during argument of the motion, went well beyond any reasonable interpretation of what the Commonwealth could be required to provide a defendant under Rule 3A:11 and the dictates of Brady v. Maryland, 373 U.S. 83 (1963). The trial court, acknowledging that the Commonwealth had an "open file" policy, granted the motion only to the extent that criminal discovery is required by Rule 3A:11.

On March 29, 1999, Bailey filed a motion to suppress the statements he made to the police on September 10, 1998. During oral argument in support of that motion, Bailey contended that any statements made to the police prior to his having been read his Miranda rights were the product of an improper custodial interrogation. He further contended that his confession given thereafter was not voluntary because the detectives through trickery and manipulation had overborne his will. After hearing evidence from the three detectives principally responsible for the interview and interrogation of Bailey, the trial court found that Bailey had not been in custody prior to his initial admission of culpability for the murders and that his subsequent confession was not the result of his will having been overborne by the detectives. The trial court denied the suppression motion.

On May 5, 1999, Bailey filed a motion for a bill of particulars requesting, <u>inter</u> <u>alia</u>, that the Commonwealth specify which of the aggravating factors of future dangerousness or vileness it would rely upon in seeking to impose the death penalty and the evidence in support thereof it would present. Following oral argument on this motion, the trial court denied the motion, finding that the indictment adequately informed Bailey of the nature of the charges brought against him.

<u>B. Guilt-determination Phase</u>

On July 20, 1999, a three-day jury trial commenced in the trial court. Evidence in accord with the facts recited above concerning the events of September 10, 1998 was developed through the testimony of various police officers and Bailey's co-workers. In addition, the Commonwealth presented forensic evidence through the testimony of Assistant Chief Medical Examiner Dr. Leah L.E. Bush.

Dr. Bush performed autopsies on the bodies of both victims. She testified that Katherine had sustained three gunshot wounds to the parieto-occipital area of the skull behind the left ear. From the absence of powder stippling on the body, Dr. Bush estimated that the shots had been fired from a distance of three feet or more and that any one of the three wounds would have been lethal. Dr. Bush further testified that Nathan had

9

sustained two close range gunshot wounds to the head and that both shots penetrated the brain and either alone would have been lethal.

The Commonwealth introduced photographs of the crime scene through the testimony of Patrol Officer Keith Tucker and paramedic Chris Skutans, who were among the first to arrive at the crime scene. Each testified that these photographs depicted what they saw inside the house, the only difference being that the house had been dark when they entered it and the photographs showed the scene illuminated rather than dark. The trial court admitted these photographs in evidence over Bailey's objection that a proper foundation had not been laid for their admission. Bailey also objected to several of these photographs and to autopsy photographs of both victims on the grounds that they were inflammatory and irrelevant. The trial court overruled this objection, finding that the photographs were relevant to show the nature of the victims' wounds.

Bailey did not testify or offer any evidence in his defense in the guilt-determination phase. Rather, Bailey relied on the content of his statement to police, arguing to the jury that it showed he had not planned or intended to kill his son, but that he had done so in a moment of passion after he panicked when he realized that Nathan would be traumatized by finding his

10

mother's dead body.  Similarly, he contended that the killing of Katherine was not premeditated, but the result of his mental anguish and emotional disturbance.

Bailey objected to two instructions proffered by the Commonwealth that permitted the jury to find Bailey guilty of two counts of capital murder based upon the two theories of capital murder stated in the indictment.  Bailey contended that the indictment charged only one count of capital murder.  The trial court found that the "indictment is subject to two different, separate sections of the statute . . . and [it would be] proper to actually have two capital murder charges."

The jury found Bailey guilty of two counts of capital murder in the killing of Nathan as charged in the indictment, of first-degree murder in the killing of Katherine, and of both firearm charges.

## C. Penalty-determination Phase

Prior to the commencement of the penalty-determination phase, the Commonwealth elected not to present evidence of Bailey's future dangerousness to society.  Thus, the Commonwealth relied solely upon the vileness aggravating factor to establish the appropriateness of imposing death sentences for the two capital murder convictions.  The Commonwealth presented evidence of vileness based upon the statutory definition that

11

"the offense . . . involved . . . depravity of mind or an aggravated battery to the victim."  Code § 19.2-264.2.

Dr. Bush again testified for the Commonwealth and reiterated her prior testimony concerning the gunshot wounds sustained by the two victims.  She further testified that the manner in which Nathan was killed was consistent with an "execution-style gunshot wound."  The Commonwealth also presented victim-impact testimony from Katherine's mother.  Prior to resting its case, the Commonwealth asked the trial court to instruct the jury to also consider all the testimony from the guilt-determination phase in considering the sentences.

Testifying for the defense, Dr. Evan Nelson, a clinical psychologist, described Bailey as suffering from a borderline personality disorder.  Dr. Nelson testified that impulsive actions are characteristic of this condition.  Dr. Nelson further opined that the killing of Nathan was "a very impulsive act . . . an impulsive, stupid, terrible, senseless act . . . and that fits with [a diagnosis of a] borderline personality."

As mentioned previously, the balance of Bailey's evidence during the penalty-determination phase was directed toward establishing that his wife's infidelity and aberrant lifestyle had emotionally traumatized Bailey and, thus, mitigated his culpability for having committed these crimes.  Although the

12

Commonwealth does not dispute the essential facts as recounted by Bailey's witnesses, Bailey's interpretation that the evidence showed him to be the "victim" of his wife's emotional manipulation was by no means established beyond controversion. It was for the jury to determine what weight to accord this evidence in determining Bailey's sentence. We are cognizant of the record and will consider it in our review of the jury's sentence even though we do not recount that evidence.

Bailey objected to the Commonwealth's proposed verdict forms for the capital murder charges, which permitted the jury to impose a death sentence upon finding either that the killing of Nathan was vile because it resulted from an aggravated battery or because the murder resulted from a depravity of mind, or that both of these circumstances were present. Bailey contended that the forms were confusing, but acknowledged that the forms properly instructed the jury that it should impose a life sentence if it found that there was insufficient proof of the vileness aggravating factor under either theory relied upon by the Commonwealth. Bailey further indicated that he did not have alternative forms to proffer. The trial court adopted the Commonwealth's verdict forms.

The jury imposed the death sentence for each of the capital murder charges, a life sentence for the first-degree murder charge, and a total of eight years for the firearm charges.

## D. Post-trial

Prior to the sentencing hearing, Bailey filed a motion requesting that the trial court obtain the records of capital murder cases maintained by this Court pursuant to Code § 17.1-313. The trial court denied the motion, indicating that it had already reviewed "a large volume" of relevant cases in anticipation of Bailey's trial and sentencing and that it was therefore not necessary for the trial court to obtain and review additional records from this Court.

In that same motion, Bailey sought to have the jury's death penalty verdict set aside on the ground that the sentence was disproportionate to sentences imposed in similar cases. Following the preparation of a pre-sentencing report, the trial court held a sentencing hearing and heard argument from Bailey concerning the appropriateness of imposing the death sentences. Bailey contended that the death sentence was not appropriate because the killing of a child by his parent was an "emotional trigger" which clouded the jury's judgment, but which did not indicate the requisite depravity of mind. Bailey asserted that the vileness of the crime was thus based solely on the question

14

of an aggravated assault, and that the forensic evidence showed that the victims "never knew what hit them" because the first shots would have been fatal or rendered the victims unconscious. The trial court confirmed the death sentences and the other sentences imposed by the jury. These appeals followed.

DISCUSSION

A. Moot Issues

Bailey's fourth assignment of error challenges the constitutionality of the Virginia death penalty statute on the ground that the Commonwealth may prove the aggravating factor of future dangerousness through evidence of unadjudicated criminal conduct. Because the Commonwealth did not present evidence during the penalty-determination phase concerning Bailey's future dangerousness to society, this issue is moot and need not be addressed. See Swann v. Commonwealth, 247 Va. 222, 228 n.2, 441 S.E.2d 195, 200 n.2, cert. denied, 513 U.S. 889 (1994); Fisher v. Commonwealth, 236 Va. 403, 414, 374 S.E.2d 46, 53 (1988), cert. denied, 490 U.S. 1028 (1989). For the same reason, Bailey's challenges to the constitutionality of the future dangerousness aggravating factor that are part of his first and third assignments of error are also moot.

## B. Issues Previously Decided

In his fourteenth assignment, Bailey asserts that the trial court erred in denying as overbroad that portion of his discovery motion that requested information from the Commonwealth beyond that requisite to meet the requirements of Rule 3A:11. Bailey contends that a capital murder defendant should be afforded more extensive discovery because of "the unique and irreversible nature of the death penalty." At the hearing on his motion, Bailey conceded that his motion requested any and all evidence Rule 3A:11 required the Commonwealth to provide him and "anything else including the kitchen sink." Bailey's motion and argument are virtually identical to those discussed in Walker v. Commonwealth, 258 Va. 54, 63, 515 S.E.2d 565, 570-71 (1999). As in that case, the record here reflects that Bailey received all of the discovery to which he was entitled. We find nothing in Bailey's argument that would warrant an extension of his discovery rights. Id. at 63, 515 S.E.2d at 571.

Bailey further contends in his fifteenth assignment of error that the trial court erred in denying his motion for a bill of particulars. There is no merit to this contention. In Strickler v. Commonwealth, 241 Va. 482, 404 S.E.2d 227, cert. denied, 502 U.S. 944 (1991), we held that when the indictment is

16

sufficient to give the accused "notice of the nature and character of the offense charged so he can make his defense," a bill of particulars is not required. Id. at 490, 404 S.E.2d at 233; see also Wilder v. Commonwealth, 217 Va. 145, 147, 225 S.E.2d 411, 413 (1976). Here, there is no challenge to the sufficiency of the indictment. As in Strickler, those parts of Bailey's request for a bill of particulars seeking disclosure of the evidence upon which the Commonwealth intended to rely in the guilt and sentencing phases of the trial "are sweeping demands for pretrial disclosure of all the Commonwealth's evidence." Strickler, 241 Va. at 490, 404 S.E.2d at 233. As such, the request for a bill of particulars was nothing more than an effort to obtain the same material Bailey had sought to obtain through his overbroad discovery motion. We find nothing in this record to warrant reconsideration of the well established principles reiterated in Strickler concerning a defendant's right to a bill of particulars.

### C. Matters Within the Trial Court's Discretion

Bailey's tenth, eleventh, and twelfth assignments of error concern rulings committed to the trial court's discretion. In each instance we find no evidence to support a finding of an abuse of that discretion and, accordingly, we hold that no error occurred.

17

Bailey contends that the trial court erred in denying his motion to be provided the services of an "expert investigator." We have consistently rejected the contention that defendants, even in capital murder cases, have an indiscriminate entitlement to the assistance of an investigator. See, e.g., George v. Commonwealth, 242 Va. 264, 271, 411 S.E.2d 12, 16 (1991), cert. denied, 503 U.S. 973 (1992). Rather, as with any request for the Commonwealth to provide a defendant with expert assistance, the defendant must demonstrate that he has a particularized need, meaning one which is material to the preparation of his defense, for the services of an expert, and that the denial of such services would result in a fundamentally unfair trial. See Husske v. Commonwealth, 252 Va. 203, 212, 476 S.E.2d 920, 925 (1996). The determination whether a defendant has adequately demonstrated a particularized need for the assistance of an expert rests within the discretion of the trial court. Id. at 212, 476 S.E.2d at 926.

Bailey asserted in his motion that he required an investigator to "locate essential witnesses and data, [and] examine and evaluate testimony and documents . . . likely to be significant at a capital murder trial." At the hearing on his motion, Bailey merely reiterated his "need [for] some additional assistance by way of the investigation" being conducted by his

18

counsel.  These assertions fall far short of demonstrating a particularized need for the services of an expert.  "Mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided."  Id. at 212, 476 S.E.2d at 925.  Accordingly, we cannot say that the trial court abused its discretion in denying Bailey's motion for the services of an expert investigator.

Bailey contends that the trial court erred in admitting into evidence thirteen photographs of the crime scene without proper foundation.  He contends that these photographs were not initially proffered by the photographer who produced them and that they did not accurately reflect the crime scene at the time the subscribing witness first observed it.[2]  The thirteen photographs at issue were introduced during the testimony of Officer Tucker and Skutans, the paramedic.  Each testified that the photographs accurately depicted the murder scene except that the scene was more brightly lit in the photographs than it had been.

---

[2]Detective James A. Dillabough of the Hampton Police Crime Scene Unit subsequently testified and identified the photographs as those he had taken during the investigation of the murders later on the morning of September 10, 1998.  Bailey, however, stated that he would not waive his prior objection.

19

We consistently have held that the admission of photographs into evidence rests within the sound discretion of a trial court, and that the trial court's decision will not be disturbed on appeal unless the record discloses a clear abuse of discretion.  Walton v. Commonwealth, 256 Va. 85, 91-92, 501 S.E.2d 134, 138, cert. denied, 525 U.S. 1046 (1998); Goins v. Commonwealth, 251 Va. 442, 459, 470 S.E.2d 114, 126, cert. denied, 519 U.S. 887(1996).  Photographs are generally admitted into evidence for two purposes: to illustrate a witness' testimony, and as an "independent silent witness" of matters revealed by the photograph.  See Ferguson v. Commonwealth, 212 Va. 745, 746, 187 S.E.2d 189, 190, cert. denied, 409 U.S. 861 (1972).  "[A] photograph which is verified by the testimony of a witness as fairly representing what that witness has observed is admissible in evidence and . . . it need not be proved by the photographer who made it."  Id.

Here, the testimony of the two witnesses that the photographs fairly represented what they had observed was adequate to establish the authenticity of the representation of the photographs.  Clagett, 252 Va. at 87, 472 S.E.2d at 268. The mere fact that the lighting was different at the time the photographs were taken is not sufficient to render their admission into evidence by the trial court an abuse of

20

discretion. See id. at 86, 472 S.E.2d at 267 (permitting jury to view videotape of crime scene where bodies of victims had been moved by emergency personnel was not abuse of discretion).

Bailey also asserts that the trial court erred in admitting four photographs of the crime scene and eight autopsy photographs of the victims, on the ground that they were cumulative, gruesome, and unduly inflammatory. Specifically with respect to the photographs of Nathan, Bailey asserts that because he stipulated to "the manner of the child's death" as depicted by diagrams in the autopsy report, the crime scene and autopsy photographs "added nothing to the information the jurors already possessed" and "did not tend to show motive, intent, method, premeditation, malice, or the degree of atrociousness of the crime." We disagree.

Admission of graphic photographs rests within the discretion of the trial court so long as they are relevant and accurately portray the scene of the crime or the condition of the victim. See Clozza v. Commonwealth, 228 Va. 124, 135, 321 S.E.2d 273, 280 (1984), cert. denied, 469 U.S. 1230 (1985). Contrary to Bailey's assertion, his stipulation to "the manner of the child's death" did not render the crime scene and autopsy photographs cumulative or irrelevant. The autopsy photographs were relevant to explain the clinical illustrations of Nathan's

21

wounds in the autopsy report.  Moreover, it is self-evident that all these photographs tended to establish the method, maliciousness, and degree of atrociousness of the crime. Walton, 256 Va. at 92, 501 S.E.2d at 138; Goins, 251 Va. at 459, 470 S.E.2d at 126.  Accordingly, we find no abuse of the trial court's discretion in the admission of any of these photographs.

D. Constitutionality of the Virginia Capital Punishment Statutes

Bailey's first, second, third, fifth, and sixth assignments of error repeat the challenges to the constitutionality of the Virginia death penalty statute and the statutory scheme under which capital murder trials are conducted and death sentences are reviewed on appeal that the trial court rejected in addressing Bailey's pre-trial motion.  We have thoroughly addressed and rejected in numerous prior capital murder cases the arguments raised in these assignments of error, and we find no reason to modify our previously expressed views on these issues.

In Breard v. Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 674-75, cert. denied, 513 U.S. 971 (1994), we rejected the assertion that capital punishment statutes do not give meaningful guidance to a jury because they do not require the jury to find that aggravating circumstances outweigh mitigating ones before fixing the death penalty.  In Breard we also

rejected the contention that the method of instructing jury on mitigation impermissibly interferes with jury's consideration of evidence offered in mitigation.  Id.

In Turner v. Commonwealth, 234 Va. 543, 552, 364 S.E.2d 483, 488, cert. denied, 486 U.S. 1017 (1988), we rejected the assertion that the vileness aggravating factor is unconstitutionally vague.  Similarly, we have repeatedly rejected the contentions that the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment, see, e.g., Joseph v. Commonwealth, 249 Va. 78, 82, 452 S.E.2d 862, 865, cert. denied, 516 U.S. 876 (1995), and that the method of review of a death sentence by trial court and by this Court on appeal are unconstitutional, see, e.g., Walker v. Commonwealth, 258 Va. 54, 61, 515 S.E.2d 565, 569 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 955 (2000).

In his seventh assignment of error, Bailey contends, inter alia, that this Court has failed in its statutory duty under Code § 17.1-313(E) to maintain "records of all capital felony cases" for use in the proportionality review required by Code § 17.1-313(C)(2), and that this constitutes a violation of "Bailey's due process and other constitutional rights."  We disagree.

Code § 17.1-313(A) requires that "[a] sentence of death, upon the judgment thereon becoming final in the circuit court, shall be reviewed on the record by the Supreme Court." As part of that mandatory review, subsection (C)(2) of the statute directs this Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17.1-313(E) further provides that:

> The Supreme Court may accumulate the records of all capital felony cases tried within such period of time as the court may determine. The court shall consider such records as are available as a guide in determining whether the sentence imposed in the case under review is excessive. Such records as are accumulated shall be made available to the circuit courts.

(Emphasis added.)

This statute uses discretionary language permitting this Court to determine the period of time within which the records of all capital felony cases will be accumulated for purposes of a proportionality review of a death sentence. Thus, in the first capital murder case reviewed by this Court following the enactment of the former version of Code § 17.1-313, the Court exercised that discretion by entering an order

> directing the Clerk of this Court henceforth to segregate and accumulate the printed records and opinions in all class 1 felony cases, to maintain a current index of those cases, and to make the index, records, and opinions of this Court available for

24

> examination upon the request of any court of record in the Commonwealth or in the federal jurisdiction.

Smith v. Commonwealth, 219 Va. 455, 482 n.8, 248 S.E.2d 135, 151 n.8 (1978), cert. denied, 441 U.S. 967 (1979); see also Jones v. Commonwealth, 228 Va. 427, 450, 323 S.E.2d 554, 567 (1984), cert. denied, 472 U.S. 1012 (1985).

This archive now maintained by the Clerk pursuant to our order contains the records of all appeals of convictions under Code § 18.2-31, whether the sentence imposed was death or life imprisonment, filed in this Court since Smith and, from 1986, those capital cases resulting in a sentence of life imprisonment first reviewed in the Court of Appeals of Virginia. In addition, these records have been summarized in digest form, and are cross-indexed according to the offense of conviction, the sentence imposed, and whether a jury or the trial court imposed that sentence.[3]

---

[3]Although Bailey offers no supporting authority for the proposition that these records are incomplete, we recognize that a small number of defendants convicted of capital murder and sentenced to life imprisonment waive their right of appeal and, thus, records of those cases are not included in the archive maintained by this Court pursuant to Code § 17.1-313(E). However, we are of opinion that such cases almost invariably involve guilty pleas and the Commonwealth's agreement not to seek the death penalty. Thus, their value for making a proportionality analysis is minimal because the record would contain little or no background upon which to make the proportionality comparison.

25

Moreover, contrary to Bailey's assertion that the maintenance of "complete" records is requisite to the preservation of his right to a proportionality review of his death sentence, nothing in the statute, nor in the case law relied upon by Bailey, prescribes the method by which an appellate court conducts a proportionality review of a death sentence. Rather, so long as the methods employed assure that the death sentence is not disproportionate to the penalty generally imposed for comparable crimes, due process will be satisfied and the defendant's constitutional rights protected.

Additional challenges to the constitutionality of the capital appellate review process raised within Bailey's seventh assignment of error have been previously addressed, and we find no reason to modify our previously expressed views. See, e.g., Payne v. Commonwealth, 233 Va. 460, 473-74, 357 S.E.2d 500, 508-09, cert. denied, 484 U.S. 933 (1987)(procedures for appellate review of death penalty cases, including expedited review, provide a meaningful appeal and are constitutional).

On a related issue, in his twentieth assignment of error, Bailey contends that the trial court erred in refusing his motion that it obtain from this Court and review the records of prior capital murder cases maintained pursuant to Code 17.1-313(E) before determining whether the death sentences were

26

appropriate, or to set them aside for "good cause shown" pursuant to Code § 19.2-264.5.[4]  This contention is without merit.

As noted above, Code § 17.1-313(E) requires that "[s]uch records as are accumulated [by this Court] shall be made available to the circuit courts."  We have previously supplied our records to a circuit court upon request.  See Bunch v. Commonwealth, 225 Va. 423, 448, 304 S.E.2d 271, 285, cert. denied, 464 U.S. 977 (1983).  However, nothing in the statute requires the circuit court to make such a request, the matter being one committed to the trial court's discretion.  Here, the trial court indicated that it had reviewed a large number of cases to permit it to fairly determine whether the death sentences were appropriate.  Moreover, nothing in the record constitutes good cause shown to set these sentences aside and for the trial court to have imposed life sentences.

---

[4]Bailey further contends that the trial court's denial of his motion constitutes a violation of his constitutional right to a proportionality review.  Bailey did not raise this argument below and, thus, we shall not consider it for the first time on appeal.  Rule 5:25.  Moreover, Bailey confuses the appropriateness review conducted by the trial court pursuant to Code § 19.2-264.5 with the proportionality review conducted by this Court pursuant to Code § 17.1-313(C)(2).  The proportionality review conducted by this Court in all death sentence cases suffices to secure the rights of the defendant in this regard.

Accordingly, we find no abuse of discretion in the trial court's denial of Bailey's motion.

In his motion to have the Virginia death penalty statute and the statutory scheme under which capital murder trials are conducted and death sentences are reviewed on appeal declared unconstitutional, Bailey contended that the Commonwealth's system of appointing counsel in capital cases results in a denial of the right to effective assistance of counsel. The trial court rejected this contention without comment.

In addition, in his eighth assignment of error, Bailey asserts that "Virginia has no system for appointment of counsel . . . [and] expends no public funds on education, assistance, or training of capital defense counsel." Bailey further asserts that appointed counsel in capital cases are "disproportionately from small firms with resources inadequate to defend a capital murder charge." Bailey also contends that the Commonwealth fails to provide meaningful review of ineffective assistance of counsel claims raised in habeas corpus petitions. According to Bailey, "[t]hese factors, individually and collectively, violate Bailey's Sixth Amendment right to counsel." We disagree.

Bailey's assertion that Virginia has no system for the appointment of counsel in capital cases is demonstrably in error. Code §§ 19.2-163.7 and 19.2-163.8 provide, in capital

28

cases, for the appointment of counsel who meet qualifications determined by the Public Defender Commission in conjunction with the Virginia State Bar.  These statutes provide the criteria to be considered in determining the qualifications for attorneys so appointed, including the requirements that they have "current training in death penalty litigation . . . [and a] demonstrated proficiency and commitment to quality representation."  We are of opinion that this statutory scheme for identifying and appointing qualified attorneys to represent indigent defendants in capital murder cases adequately safeguards those defendants' constitutionally guaranteed right to counsel.

Bailey cites no authority for the proposition that a state is required, as part of its obligation to afford indigent defendants with appointed counsel in capital cases, to further provide for the education, assistance, or training of such counsel.  In any case, there is no merit to Bailey's contention that Virginia fails to allocate public funds for these purposes. In addition to establishing and funding the Public Defender Commission, the General Assembly, through the appropriation made for the Virginia State Bar, allocates funds for the Virginia Capital Representation Resource Center.  See, e.g., 1998-2000 Executive Budget, 1999 Amendments, page B-17 (1999).

29

Moreover, in 1998, the General Assembly authorized a study of "the quality of capital representation of indigent defendants in Virginia . . . [and] the standards for qualification of counsel promulgated pursuant to [Code] § 19.2-163.8." House Joint Resolution 190, Acts 1998, at p. 2649. Although recommending certain improvements in the manner in which counsel are appointed in capital cases, the authors of the study concluded that "[t]he overall state of the system for representation of indigent capital defendants is good." Report of the Virginia State Crime Commission, Capital Representation of Indigent Defendants, House Document 60, at 1 (1999). According to a survey conducted as part of the study, the quality of representation by appointed counsel in capital murder trials, as appraised by the trial court judges, met or exceeded the desired level of expertise and performance ninety-eight percent of the time. Id. at 19. This empirical data refutes Bailey's wholly unsupported assertion that appointed counsel in capital murder cases are generally unqualified to provide effective representation.

We further reject Bailey's contention, also unsupported by reference to any credible data, that appointed counsel in capital murder trials are "disproportionately from small firms with resources inadequate to defend a capital murder charge."

Pursuant to Code § 19.2-163, counsel appointed in capital murder cases may receive a fee in "an amount deemed reasonable by the court" and "payment of such reasonable expenses incurred." Accordingly, the ability of an appointed attorney to represent a capital murder defendant is not limited to the independent resources available to that attorney from his or her law firm because the trial court will compensate the attorney for any reasonable expenditure of time and expenses. Moreover, we are unwilling to accept Bailey's unsupported assertion that attorneys in "small firms" are not in a position to adequately defend a client charged with capital murder.

Bailey's contention that Virginia fails to provide meaningful review of ineffective assistance of counsel claims raised in habeas corpus petitions does not state an allegation of a facial or systemic violation of the constitutionally guaranteed right to counsel. Moreover, Bailey has not proffered any evidence in support of this contention. Accordingly, we reject this unsupported contention.

For these reasons, we hold that Virginia's statutory scheme for the conduct of capital murder trials and the review of death sentences does not violate the due process rights and other protections afforded by the Fifth, Sixth, Eighth and Fourteenth Amendments.

E. Suppression of Bailey's Statements to Police

     In his thirteenth assignment of error, Bailey contends that
the trial court should have suppressed all statements made by
him to the police because his initial confession was made before
he received <u>Miranda</u> warnings.  He further contends that his
detailed confession was the result of police coercion.  We
disagree with both of these contentions.

     Bailey premises his argument that his initial statements
were inadmissible and, thus, taint his subsequent full
confession, given after he received <u>Miranda</u> warnings, on the
ground that he had not waived his rights against self-
incrimination and to the benefit of counsel "during in-custody
questioning."  The difficulty with this argument is that it
fails to address the trial court's finding that prior to
Bailey's making his initial confession he was not in custody.

     In <u>Miranda</u>, the Supreme Court held that, before an
individual may be questioned by police, he must be warned of his
right to remain silent and his right to an attorney only when
that "individual is taken into custody or otherwise deprived of
his freedom by the authorities in any significant way and is
subjected to questioning."  <u>Miranda v. Arizona</u>, 384 U.S. 436,
478 (1966).  The Supreme Court subsequently explained in <u>Oregon</u>

32

v. Mathiason, 429 U.S. 492 (1977), that Miranda warnings are implicated only during a custodial interrogation:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

Id. at 495.

We have also observed that Miranda warnings are not required in every instance when a suspect is interrogated at a police station. Coleman v. Commonwealth, 226 Va. 31, 47, 307 S.E.2d 864, 872 (1983), cert. denied, 465 U.S. 1109 (1984). We have stated that "[i]t is the custodial nature rather than the location of the interrogation that triggers the necessity for giving Miranda warnings." Id. at 47, 307 S.E.2d at 872; accord Burket v. Commonwealth, 248 Va. 596, 605, 450 S.E.2d 124, 129 (1994), cert. denied, 514 U.S. 1053 (1995).

Bailey clearly was not in custody such as is contemplated by Miranda at the time he made his initial confession. The record shows that he voluntarily accompanied police to the

33

police station in an effort to continue the ruse that his wife had received threatening telephone calls and notes.  His interaction with police throughout the morning and into the early afternoon was entirely voluntary and Bailey was made aware on more than one occasion that he was free to leave, if he so desired.  Accordingly, we find no merit to Bailey's contention that any statements he made prior to being given the Miranda warnings were obtained in violation of his Fifth Amendment rights.  Thus, Bailey's initial confession was admissible and did not taint his subsequent confession.

Bailey nonetheless contends that the detailed confession, obtained after he had been taken into custody and was given the Miranda warnings, was not voluntary.  He contends that "[t]he interrogators effectively tricked, coerced and cajoled [him] into making incriminating statements" and, thus, that his "will was overborne by the interrogators."  We disagree.

When determining whether a defendant's will has been overborne, the totality of the circumstances, including the defendant's experience and background as well as the conduct of the police, must be examined.  Gray v. Commonwealth, 233 Va. 313, 324, 356 S.E.2d 157, 163, cert. denied, 484 U.S. 873 (1987). While the question whether a statement is voluntary is ultimately a legal rather than a factual one, subsidiary factual

34

determinations made by the trial court are entitled to a presumption of correctness.  Thus, the trial court's finding that Bailey's will was not overborne is a factual finding, entitled on appeal to the same weight as a finding by a jury, and will not be disturbed unless plainly wrong.  Witt v. Commonwealth, 215 Va. 670, 674-75, 212 S.E.2d 293, 297 (1975). The evidence summarized above is fully sufficient to support the trial court's finding that Bailey knowingly and voluntarily waived his Fifth Amendment rights when he gave his detailed confession to the police.  Thus, the trial court's denial of Bailey's suppression motion was not error.

### F. Jury Instructions and Sentencing Form

In his sixteenth assignment of error, Bailey contends that the trial court erred during the guilt-determination phase in giving separate instructions proffered by the Commonwealth defining capital murder as the killing of more than one person as a part of the same act or transaction, Code § 18.2-31(7), and capital murder as the killing of a person under the age of fourteen by a person age twenty-one or older, Code § 18.2-31(12).  Bailey contends that the instructions were confusing in that they implied to the jury that "it might convict Bailey of capital murder twice, even though Bailey had only been indicted on a single count of capital murder, which set forth

35

disjunctively the two grounds for the capital murder charge."
The Commonwealth contends that the indictment was worded to
permit convictions for two offenses of capital murder.  We agree
with the Commonwealth.

In Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293
(1999), the defendant was charged in separate indictments with
two offenses of capital murder of one victim.[5]  We held that "it
is clear, as well as logical, that the General Assembly intended
for each statutory offense [in Code § 18.2-31] to be punished
separately 'as a Class 1 felony.'"  Id. at 228, 509 S.E.2d at
301.  In this case, two offenses of capital murder were charged
in a single indictment.  This distinction from Payne does not,
however, preclude the conclusion that the indictment charged two
capital murder offenses upon which Bailey could be convicted and
sentenced.

A single indictment may charge "[t]wo or more offenses
. . . if the offenses are based on the same act or transaction."
Rule 3A:6.  Contrary to Bailey's assertion, the indictment for
the capital murder of Nathan does not charge two offenses of
capital murder exclusively in the disjunctive.  Rather, the

---

[5]In Payne, the Court consolidated two separate capital
murder appeals.  In both instances, however, there were multiple
indictments charging the defendant with two counts of capital
murder of one victim.

indictment clearly charges that the killing occurred as part of the same act or transaction as the killing of Katherine "and/or" as the killing of a person under the age of fourteen by a person age twenty-one or older.  Thus, here, as in Payne, the Commonwealth was entitled to seek a separate conviction and death sentence on each offense of capital murder charged in the indictment.

In his seventeenth assignment of error, Bailey contends that the trial court erred in presenting the jury with verdict forms in the penalty-determination phase that "were inherently confusing and led to a substantial risk of an unreasoned and hence arbitrary and capricious jury verdict."  Bailey contends that this is so because the verdict forms set out three alternative theories under which the jury might find that the "vileness" predicate would apply.

The Commonwealth contends that because Bailey proffered no alternative verdict forms, he is deemed to have waived his objection to the forms used by the trial court.  Cf. Atkins v. Commonwealth, 257 Va. 160, 178 n.8, 510 S.E.2d 445, 456 n.8 (1999).  However, unlike the circumstance in Atkins, where we held that a proffer of alternative verdict forms was sufficient to preserve an objection even though there was no express objection to the improper verdict forms proffered by the

37

Commonwealth, here there is an express objection on the record. When a principle of law is materially vital to the defendant in a criminal case, it is reversible error for the trial court to fail to correct a defective instruction or verdict form when the error is patent or the subject of a proper objection. Id. at 178, 510 S.E.2d at 456; accord Whaley v. Commonwealth, 214 Va. 353, 355-56, 200 S.E.2d 556, 558 (1973); Bryant v. Commonwealth, 216 Va. 390, 392-93, 219 S.E.2d 669, 671-72 (1975). Thus, although the better practice would have been for Bailey to proffer alternative verdict forms, he was not required to do so in order to preserve his objection.

We agree with the Commonwealth, however, that the verdict forms in this case were not confusing and did not misstate the law. The verdict forms merely recited the alternative findings the jury might make in reaching its sentencing decision. Thus, unlike the situation in Atkins, the trial court's instructions on sentencing and the verdict forms were in accord with and correctly reflected the law.

### G. Sufficiency of the Evidence

In his ninth assignment of error, Bailey contends that the trial court erred in failing to strike the Commonwealth's evidence presented during the guilt-determination phase with respect to the capital murder charges arising from the killing

38

of Nathan.  He asserts that the Commonwealth's evidence was insufficient to show that he acted with premeditation in that killing.  In the appeal of his related convictions, Bailey further contends that the evidence was insufficient to support his conviction for the first-degree murder of Katherine, asserting that the evidence showed that he was "emotionally distraught" and "acted impulsively and without malice."[6]  We disagree.

The question of premeditation is a question to be determined by the fact-finder.  Peterson v. Commonwealth, 225 Va. 289, 295, 302 S.E.2d 520, 524, cert. denied, 464 U.S. 865 (1983).  "To establish premeditation, the intent to kill need only exist for a moment."  Id.

The evidence showed that Bailey acquired the murder weapon several weeks in advance of the killings and made elaborate efforts over several months to deflect future suspicion from himself.  From this evidence alone, there can be no doubt that the murder of Katherine was deliberate and premeditated.

Even accepting Bailey's contention that initially he had not considered the impact of Katherine's murder on his son and

---

[6]This is the only assignment of error in the noncapital appeal that is not duplicated by an assignment of error raised in the capital appeal.  See note 1, supra.

39

had not intended to kill him also, the record, including Bailey's own statement, shows that his decision to kill his son was not a sudden impulsive act, as he contends. Rather, the record shows that he took deliberate action after contemplation, however brief. The evidence in this case is closely on point with that in Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2d 394, cert. denied, 510 U.S. 848 (1993), where the defendant was convicted of killing his estranged wife and their infant son. In Stewart, we said that "evidence that a weapon was placed against a victim's head when the fatal shot was fired . . . is sufficient alone to support a finding that 'the shot was fired deliberately and with premeditation.'" Id. at 240, 427 S.E.2d 406 (citation omitted). The record in this case shows that Bailey went to Nathan's bedroom and shot the child twice in the head at close range. This evidence was sufficient for the jury to determine that the killing of Nathan was a deliberate and premeditated act.

In his eighteenth assignment of error, Bailey contends that the trial court erred in failing to set aside the death sentences imposed by the jury on the ground that there was insufficient evidence of vileness in the killing of Nathan. We disagree.

Bailey premises his argument on this issue on his contention that the killing of Nathan was an impulsive act of misguided compassion.  We have already rejected this contention, finding that there was sufficient evidence of premeditation even under Bailey's self-serving characterization of the events. Similarly, we find sufficient evidence in the record to support the Commonwealth's contention that the killing of Nathan was committed in the course of an aggravated battery and with depravity of mind.  Cf. Walker, 258 Va. at 72, 515 S.E.2d at 575 (multiple gunshot wounds establish aggravated battery); Stewart, 245 Va. at 246, 427 S.E.2d at 409 (manner of killing and attempts to disguise crime reflect depravity of mind).

### H. Sentence Review

In his nineteenth assignment of error, Bailey contends that the trial court erred in failing to set aside the two death sentences on the ground that they were "excessive and disproportionate" and "imposed under the influence of passion, prejudice, and other arbitrary factors."  These contentions are reflective of the requirements of Code § 17.1-313(C)(1) that we determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and Code § 17.1-313(C)(2) that we determine "[w]hether the sentence of death is excessive or disproportionate to the

41

penalty imposed in similar cases, considering both the crime and the defendant."  Accordingly, we will address Bailey's assignment of error and conduct the review required by statute jointly.

Bailey contends that the death sentences were excessive and disproportionate because the evidence showed that the capital murder of Nathan did not involve torture or a predicate felony, and that death was instantaneous.  He further contends that "it was an impulsive killing with a gun, indistinguishable from literally thousands of gun-related killings across the country where the punishment is a term of imprisonment rather than death."  We disagree.

Without giving any credence to Bailey's unsupported assertion that there are "literally thousands" of similar murders committed in this country, we may nonetheless distinguish this crime on several grounds from the type of impulsive killings to which Bailey alludes.  The forensic evidence that Nathan's wounds resulted from an "execution-style" shooting rebuts Bailey's claim that the killing was impulsive. Moreover, the evidence amply supports the conclusion that Bailey planned this killing along with the killing of Katherine and that he took elaborate steps to deflect suspicion from himself.

42

We have examined the records of all capital murder cases reviewed by this Court, including those cases in which a life sentence was imposed. We have given particular attention to those cases in which, as here, the death penalty was based on the "vileness" predicate alone. Based on this review, we conclude that Bailey's death sentences are not excessive or disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth for comparable crimes. See, e.g., Stewart, 245 Va. at 247, 427 S.E.2d at 410; Davidson v. Commonwealth, 244 Va. 129, 136, 419 S.E.2d 656, 660, cert. denied, 506 U.S. 959 (1992); Buchanan, 238 Va. at 418, 384 S.E.2d at 774.

Bailey makes no particularized argument that the death sentences were imposed under the influence of passion, prejudice, or other arbitrary factors. However, within his argument on disproportionality, Bailey contends that "the jury's passions and prejudice had been inflamed by the mere fact that the killing involved a two-year-old boy." Assuming this statement is intended to address the review required by Code § 17.1-313(C)(1), it is merely conclusory and we find nothing in the record to support it.

Undeniably, the killing of one's own child is among the most abhorrent crimes for a jury to contemplate when considering

43

an appropriate sentence, especially when, as here, that crime occurs in conjunction with the equally abhorrent crime of the killing of one's wife. Nonetheless, the mere fact that a crime is abhorrent does not raise a presumption that the jury will be unable to set aside its natural emotions and fairly consider all the evidence. Our review of this record does not disclose that the jury failed to give fair consideration to all the evidence both in favor and in mitigation of the death sentences, and we find nothing in this record which suggests that the jury, or the trial court in reviewing the verdicts, imposed the death sentences under the influence of passion, prejudice, or other arbitrary factors.

CONCLUSION

Having reviewed the capital murder convictions, the death sentences imposed thereon, and the related convictions and sentences for first-degree murder and the firearm charges, we find no reversible error in the record, and perceive no reason to commute the death sentences. For these reasons, we will affirm the judgment of the trial court.

Record No. 992840 — <u>Affirmed</u>.
Record No. 000151 — <u>Affirmed</u>.