UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, Fulton and White
Argued at Norfolk, Virginia


LAQUADRIC KENEZ PITTMAN

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0681-22-1                      JUDGE JUNIUS P. FULTON, III
                                                    APRIL 25, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SOUTHAMPTON COUNTY
L. Wayne Farmer, Judge

Daniel W. Hall for appellant.

William K. Hamilton, Assistant Attorney General (Jason S. Miyares,
Attorney General; Maureen E. Mshar, Assistant Attorney General,
on brief), for appellee.


On March 23, 2021, following a bench trial, the Circuit Court of Southampton County

convicted Laquadric Pittman of obtaining property by false pretenses and conspiring with

another to obtain property by false pretenses, in violation of Code §§ 18.2-178 and 18.2-22.

Pittman appeals his convictions, challenging the sufficiency of the Commonwealth's evidence

against him, as well as the trial court's admission of certain testimony relating to a video, which

was not, itself, admitted into evidence. For the following reasons, we affirm.

I. BACKGROUND[1]

In June of 2019, a man, who identified himself as Norman Richards, contacted All

American Auto Sales and Cycles ("AAASC"), located in Ivor, Southampton County, offering to

---

* This opinion is not designated for publication. *See* Code § 17.1-413.

[1] "Under well-settled principles of appellate review, we consider the evidence presented
at trial in the light most favorable to the Commonwealth, the prevailing party in the circuit
court." *Porter v. Commonwealth*, 276 Va. 203, 215-16 (2008).

buy two motorcycles. Richards initially spoke with Celon Cahoon, one of the store managers. Richards agreed to pay $3,555 by credit card for two street legal, lime green motorcycles, a Tao Tao and a Johnny Pag Malibu.

Richards attempted to pay by credit card over the phone, but the charge did not go through. Ultimately the parties decided that Richards's uncle would provide the card for the motorcycle purchase. Cahoon testified at trial that before any vehicles were picked up, he contacted the person whose number was given to him by Richards and spoke with a person who identified himself as Kenneth Height and gave permission for a credit card he provided to be used to purchase the motorcycles. Cahoon ran the card for the purchase, and it was accepted. Cahoon drew up the bill of sale which listed Richards and Height as purchasers.

On June 21, 2019, a man identifying himself as Kenneth Height, with identification and a credit card indicating as much, arrived at the store to complete the purchase. William Clark, another store manager at AAASC, was present and made copies of the identification and credit card. He was only able to provide Height with the title and manufacturer's certificate for the Tao Tao motorcycle because the other motorcycle, the Johnny Pag Malibu, would not be ready for delivery until the next day. Clark testified that Height arrived driving a short wheelbase General Motors U-Haul. Because Height did not have a way to secure the Tao Tao motorcycle, Clark loaned him a set of his personal brand-new red ratchet straps. Height then departed, taking the Tao Tao motorcycle with him. The next day, as he was working on the Johnny Pag Malibu, Clark received calls inquiring about whether that motorcycle was ready. Soon after those calls, Clark received a call from an unidentified woman who claimed that the two motorcycle sales were a scam. The caller also sent a video to Clark which Clark viewed.

Based upon what was depicted in the video, Clark called the Southampton County Sheriff's Office. Sergeant Bruce Turner and Deputy Worth went to AAASC to investigate

Clark's report. Both were driving marked police vehicles. At first, Sergeant Turner parked his vehicle behind the building, so as not to "spook" Height when he came in to collect the second motorcycle. And Deputy Worth was parked down the road "out of sight." Sergeant Turner reviewed the photocopy of the credit card and driver's license Height had provided. He "ran the number off of the [driver's license] that was offered" to AAASC by Height, which came back as belonging to a deceased woman. He also ran the name Kenneth Height, as well as the date of birth on the driver's license, and those "didn't come back."

Because the man identified as Height was to return that day to pick up the other motorcycle, Sergeant Turner waited for the man to arrive. When Height arrived to pick up the second motorcycle, Clark observed that the man was not equipped to ride or transport the motorcycle. Height told Clark that "his boys [were] coming to pick [the motorcycle] up." Sergeant Turner then confronted the man. He inquired whether he was Kenneth Height. The man responded "yes" and presented Sergeant Turner with the same driver's license from the photocopy taken previously. Sergeant Turner detained the man and proceeded to question him about his real identity. The man eventually responded, "I give up. You got me." Sergeant Turner found a social security card in the man's pocket which identified him as Roderick Davis, the co-defendant in this case.

After Davis was detained, Sergeant Turner called Deputy Worth to come to the store to aid in the investigation. Deputy Worth parked his vehicle "right in the front of the store." Thereafter, Clark saw a U-Haul being operated by a person whom he recognized from the video coming from the eastbound direction of Route 460 with a left turn signal on. Clark observed the vehicle start to slow down, as if the driver of the vehicle intended to turn into the shop, but then continue past without turning. Clark informed Sergeant Turner that the driver had been in the video. Sergeant Turner pursued the U-Haul. He testified that he stopped the U-Haul truck and

proceeded to search it. The back of the truck was empty, except for two red ratchet straps that were hanging on the wall of the cargo bay. However, Sergeant Turner testified that "at the time . . . those red straps [didn't] mean anything" to him. Therefore, he let the driver go.

Thereafter, Sergeant Turner reviewed the video that had been sent to Clark and made the connection between the U-Haul truck, the red ratchet straps, the two motorcycles, the driver of the truck (later identified as Pittman), and Davis.

Cahoon testified that about two days after the purchase on the 21st, a representative from the bank called and told him that the bank had taken the purchase money back. Sergeant Turner continued his investigation of the alleged scheme. He learned that the credit card used to purchase the motorcycles had a stolen credit card number belonging to an individual from another state. Sergeant Turner eventually happened upon the U-Haul, which was parked outside of an apartment complex "no more than half a mile" from where Pittman resided. Pittman was eventually indicted on the instant charges and subsequently arrested.

At trial, the Commonwealth elicited the testimony noted above from Clark and Sergeant Turner regarding what the video depicted. This testimony was offered prior to the Commonwealth offering the video itself into evidence. Pittman initially objected only to the admissibility of the video itself. He argued that neither witness had "firsthand knowledge" of the video because neither created the video, nor did they observe the contents of the video when it was being recorded. After the trial court heard testimony concerning the contents of the video, Pittman clarified and expanded his objection to the witness testimony regarding what the video depicted. Therefore, Pittman argued at trial that: (1) the video could not be properly authenticated pursuant to Virginia Rule of Evidence 2:901, and (2) because the video could not be authenticated, any testimony relating to its contents would be improperly admitted, as that testimony would not be relevant.

- 4 -

The trial court overruled Pittman's objection as to Clark and Sergeant Turner's testimony about the video, stating that any issues regarding lack of firsthand knowledge of the contents of the video "[go] to the weight" of the testimony, not admissibility. Later, the trial court agreed that the video was not properly authenticated pursuant to Rule 2:901, and therefore was not admissible, stating that the Commonwealth had not laid adequate foundation to admit the video into evidence. The trial court noted that neither witness could testify as to whether the video fairly and accurately depicted the scene because neither was present when the video was made. In doing so, the trial court acknowledged that its two rulings "sound[] like an illogical set of rulings."

Clark testified that the video depicted Pittman sitting astride the Tao Tao motorcycle. According to Clark, Pittman was depicted in the video talking about "committing felonies every day, how they got away with this jaint." Further, Clark knew that the Tao Tao motorcycle was his because he knew it was the only lime green one in the State of Virginia. The motorcycle was still strapped in the way Clark had helped the purchaser strap it in. Clark testified that Pittman was in the back of the vehicle saying he was going back to get the other motorcycle. Clark also testified that the video depicted the certificate of origin for the Tao Tao motorcycle as well as the bill of sale from AAASC. Sergeant Turner testified to what he saw in the video, noting that: (1) he recognized Pittman in the video as the driver of the U-Haul, (2) Pittman made statements to the general effect that they scam people all the time, (3) the lime green Tao Tao motorcycle was the motorcycle in the video, and (4) Pittman was referred to as "Quad" and shown riding the Tao Tao motorcycle.

Based on the evidence and testimony admitted at trial, the trial court found Pittman guilty of both charges. In doing so, the trial court explicitly relied on Clark and Sergeant Turner's testimony pertaining to what the video depicted. The trial court stated:

So what shows . . . the knowledge? . . . Had the young man chosen not to be on a video talking about scamming people and being involved in felonies we wouldn't have evidence of his guilty knowledge of this plan, but what we have is him--and again, we're not talking about months later, we're talking about in very recent possession of a motorcycle that we know was obtained fraudulently and, more importantly, the documents that were received that same day in exchange at the time of that motorcycle. All of that, combined with the video, shows his guilty knowledge, his involvement in the conspiracy. And again, the conspiracy, we do not need--it's helpful, but we do not need a coconspirator to come and say we had an agreement. Conspiracies most frequently are shown by people's actions and his actions, his comments on the video, combined with his actions of showing up to pick up the motorcycle, is enough to establish that he was in agreement with these individuals to engage in an ongoing criminal enterprise. I find him guilty as charged of both charges.

By final order entered April 28, 2022, the trial court sentenced Pittman to a total period of five years' incarceration with four years suspended.

## II. ANALYSIS

Pittman assigns error to his convictions, asserting that: (1) the evidence was not sufficient to prove beyond a reasonable doubt that there was a conspiracy to obtain the property in question by false pretenses, (2) the evidence was not sufficient to prove beyond a reasonable doubt that Pittman participated in any such conspiracy, (3) the evidence was not sufficient to prove beyond a reasonable doubt that Pittman actually obtained any property in question by false pretenses, and (4) the trial court erred by admitting the testimony of Clark and Sergeant Turner, where those witnesses testified to what they saw on an unauthenticated video provided to Clark by an anonymous third party. The Commonwealth disagrees, arguing that the evidence was sufficient, that Pittman did not preserve his fourth assignment of error regarding the witnesses' testimony and that even if he did preserve his objection, the trial court nevertheless did not err in allowing Clark and Sergeant Turner to testify as to the contents of the video. Because Pittman's assignments of error challenging the sufficiency of the evidence turn on the circumstantial

- 6 -

evidence adduced by the testimony related to the video, we first address the evidentiary question raised by Pittman.

### A. Testimony Related to the Excluded Video

This Court reviews a trial court's evidentiary decisions for abuse of discretion. *Howard v. Commonwealth*, 74 Va. App. 739, 753 (2022). A trial court abuses its discretion if it: (1) fails "to consider a relevant factor that should have been given significant weight," (2) "consider[s] and giv[es] significant weight to an irrelevant or improper factor," or (3) "commits a clear error of judgment." *Fields v. Commonwealth*, 73 Va. App. 652, 672 (2021). We will find an abuse of discretion only when "reasonable jurists could not differ." *Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019). By definition, a circuit court "abuses its discretion when it makes an error of law." *Tyler v. Commonwealth*, 75 Va. App. 218, 228 (2022). "Furthermore, such evidentiary issues presenting a question of law are reviewed *de novo* by this Court." *Brown v. Commonwealth*, 54 Va. App. 107, 112-13 (2009) (quoting *Abney v. Commonwealth*, 51 Va. App. 337, 345 (2008) (internal quotation marks omitted)).

Pittman argues on appeal that it was error for the trial court to allow Clark and Sergeant Turner to testify as to the contents of the video, notwithstanding the fact that the trial court subsequently ruled that the video itself was not admissible because it could not be properly authenticated. The Commonwealth responds that: (1) Pittman failed to preserve this objection at trial, and (2) even if he did preserve his objection, the trial court "would not have erred in allowing this testimony over an objection on authentication or relevancy grounds."

As an initial matter, we disagree with the Commonwealth that Pittman failed to preserve his objection to the trial court's ruling. The record illustrates that, though at first it was unclear whether Pittman's counsel was objecting to the testimony describing the video or the admissibility of the video itself, eventually Pittman's counsel made clear his objection to both.

And more importantly, the trial court understood his objections and ruled on them. After an initial colloquy between the court and the parties, the trial court inquired of Pittman's counsel:

> But let's separate the issues out, because at this point [the Commonwealth] hasn't offered to introduce the video. . . . I think [Clark] can testify, can he not, to what he observed on the video[?] . . . I think it goes more to weight, the weight of the evidence rather than admissibility; does it not? He can't testify to what he saw?

Pittman's counsel responded: "There's no foundation laid whatsoever as to him being able to authenticate what he's seeing in this video and identify these things, so I suggest he's not able to offer this Court that information."

Then, after testimony from Clark identifying the Tao Tao motorcycle, paperwork which was provided in the transaction, and the defendant as depicted in the video, and another colloquy between the court and counsel as to the admissibility of the video itself, the trial court stated:

> I'm going to sustain the objection to the video itself. I think it's more like the [example I gave earlier]. I don't think a foundation has been laid. I maintain and my ruling is that the defendant can testify to what he observed on the video. I'm mindful of the fact, as Mr. Cooke points out, that sounds like an illogical set of rulings, that you can say what's on it, but you can't see it, but I think from the perspective of whether or not it's been authenticated, again, if it fairly and accurately depicted a scene familiar to the witness, he can't testify to that. He didn't see the video, he wasn't present when the video was made. That's offered, there's no dispute about that. I don't think the video is admissible on its face. I think he can testify as to what he observed on the video.

The record therefore makes clear that Pittman's counsel properly objected to the testimony itself and that the trial court actually understood the objection and ruled on it.

Turning to the merits of Pittman's assignment of error, while at first the trial court's evidentiary rulings may seem inconsistent, we hold that the trial court did not err in admitting the testimony at issue. Although a video does not need to be admitted into evidence in order for a witness to testify about it, *Brown*, 54 Va. App. at 112-18 (holding that the trial court did not err

in allowing witness to testify as to the contents of a video without admitting the video itself), once the trial court excluded the offered video evidence on the basis of authenticity, thereby ruling that the video itself was not reliable and therefore not relevant to this offense, it's previous ruling that Clark—and subsequently Sergeant Turner—were allowed to testify as to the contents of that video might be viewed as internally inconsistent. However, we hold that the trial court did not err in admitting the limited testimony about the video, as the Commonwealth proved through Clark's testimony sufficient indicia of reliability to prove the relevance and probative value of his testimony and that of Sergeant Turner regarding specific portions of the video.

Clark testified that: (1) he recognized the lime green Tao Tao motorcycle as his and that the certificate of origin and bill of sale were depicted in the video, (2) he recognized the short wheel-base GMC U-Haul and his red ratchet straps still attached to the wall of the cargo bay as those used by Davis the day before, and (3) he identified Pittman, depicted in the video, as the person driving the U-Haul when Davis came to pick up the second motorcycle. Though the trial court ruled that the video in its entirety was not admissible, we determine that the trial court *could* have admitted the video, based upon existing case law.[2]

---

[2] "The requirement of authentication or identification [is] a condition precedent to [the] admissibility [of evidence that] is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. Rule 2:901 is concerned with things, and the requirement to authenticate certain evidence does not extend to live testimony itself. *See United States v. Grant*, 967 F.2d 81, 83 (2d Cir. 1992). "[Videos] are admissible under either of two theories: 'to illustrate a witness's testimony' or 'as an "independent silent witness' of matters revealed by the [video]." *Bennett v. Commonwealth*, 69 Va. App. 475, 487 (2018) (quoting *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000)). "'Once the threshold for proving admissibility' was met . . . questions concerning the [accuracy of videos are] relevant only to the [fact finder]'s assessment of the weight to give it." *McDaniel v. Commonwealth*, 73 Va. App. 299, 316 (2021) (quoting *Church v. Commonwealth*, 71 Va. App. 107, 122 (2019)). "Where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990). Here, Clark's testimony regarding specific portions of the video provided a sufficient basis to meet the "threshold" authentication requirements of Rule 2:901, and therefore, the trial

Trial courts exercise discretion in admitting or excluding evidence. *Howard*, 74 Va. App. at 753. In bench trials, the judge may admit evidence which contains relevant and probative value and irrelevant value as well, and a presumption exists that the judge disregards that portion which is not relevant.[3] *See Pierce v. Commonwealth*, 50 Va. App. 609, 616 (2007) ("[I]n a bench trial, the trial judge is presumed to disregard prejudicial or inadmissible evidence, and this presumption will control in the absence of clear evidence to the contrary." (quoting *Hall v. Commonwealth*, 14 Va. App. 892, 902 (1992) (en banc))). The trial court here could have deployed just such a technique to view the entire video and disregard that which was not relevant. However, the trial court decided to not do that, but in its exercise of such discretion, allowed an excised version of the events depicted on the video to come in via the testimony of the witnesses who observed the video.

We liken this scenario to that of a trial court admitting only certain parts or aspects of a particular piece of evidence but not the whole thing; a practice that is soundly within the discretion of the trial court. *See, e.g.*, *Nottingham v. Commonwealth*, 73 Va. App. 221, 232 (2021) (affirming a trial court's decision to exclude a videotape of a police interview of a victim but permit the defendant to question the detective who conducted the interview about the victim's demeanor during the interview). In *Nottingham*, the

> appellant sought to introduce the entire videotape, which included footage of [the victim] interacting with [a] nurse and talking on her cell phone. Appellant made no effort to redact irrelevant or inadmissible hearsay material from the recording. The court's ruling enabled appellant to present evidence of [the victim]'s prior demeanor to the [fact-finder] while preventing admission of other inadmissible evidence included within the full videotape.

---

court was within its discretion to exclude the video itself but allow certain testimony as to the parts of the video the court deemed relevant.

[3] In fact, the trial court stated as much at trial, noting that "[i]t's a bench trial so the Court can disregard what it hears that is not admissible for one purpose, [but] may be for another."

*Id.* This Court endorsed the trial court's exercise of discretion in *Nottingham*, stating that "[f]or discretionary decisions, 'the court has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212-13 (2013)). The trial court here exercised that same discretion.

The dissent takes issue with our rationale, in part, relying on the "law of the case" for the proposition that because the Commonwealth failed to challenge the trial court's ruling regarding the admissibility of the video itself, the Commonwealth is deemed to have waived its right to challenge that decision, leaving us with the conclusion that the requirements of Rule 2:901 were not met. We see this particular case differently. The question on appeal that we are tasked to decide is *whether the trial court erred in allowing Clark and Sergeant Turner's testimony*. In answering that question, we conclude that the trial court in fact found sufficient indicia of reliability in the video to allow Clark and Sergeant Turner to testify to what they recognized and what they saw. Therefore, the law of the case does not bind this Court to the conclusion that Clark did not have sufficient personal knowledge to authenticate the relevant aspects of the video.

Further, the dissent notes that a video can only be authenticated in one of two ways: "*either* to illustrate a witness's testimony *or* to serve as an 'independent silent witness' of matters depicted in the video." Our case law requires that in order to satisfy the first method, the witness purporting to authenticate the video must attest that the contents of the video "fairly represent what that witness has observed." *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000). The dissent takes the position that this would require that the witness actually be present—*on scene*, as it were—to properly authenticate the contents of the video. Therefore, because here, neither Clark nor Sergeant Turner were present when the video was made, neither can testify to facts

sufficient to properly authenticate the video at issue. We disagree with the dissent in one small regard. Virginia case law on this point allows a witness to authenticate the contents of a video—notwithstanding the fact that he was not present when the video was recorded—simply based on the fact that he recognizes certain key components of a video, thus establishing the requisite indicia of reliability to satisfy the requirements of Rule 2:901. Here given Clark's familiarity with Pittman himself, the Tao Tao motorcycle, the red ratchet straps, and the paperwork associated with the "sale" which took place within less than twenty-four hours of his receipt of the video, Clark could provide sufficient testimony to satisfy the authentication requirements contained in Rule 2:901.

Finally, the dissent argues that *Reedy* is "inapplicable" here and that the "increasingly common use of evolving technology to create 'deep fakes'—images, videos, audio, or other media that have been digitally altered to appear authentic—emphasizes the importance of strictly adhering to the authentication and personal knowledge requirements of Rules 2:901 and 2:602, respectively." First, we note that Clark did have "personal knowledge" of several of the key components of the video, pursuant to Rule 2:602. As recited above, Clark recognized (1) the motorcycle, (2) the red ratchet straps, (3) the U-Haul truck, (4) the bill of sale, and (5) Pittman himself, from the day Pittman attempted to drive the U-Haul to the store to pick up the second motorcycle. We also note that there is no evidence of or contention that would call into question the veracity of the video or the possibility of a "deep fake." And we reiterate that where there is "mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." *Reedy*, 9 Va. App. at 391.

Therefore, the trial court did not err in allowing Clark to testify to the contents of the video, notwithstanding the fact that the trial court excluded the video itself.

## B.  Sufficiency of the Evidence

Having determined that the testimony of the two witnesses describing the contents of the video was properly allowed, we turn next to Pittman's challenges to the sufficiency of the Commonwealth's evidence.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).  "Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v. Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)).  To the extent determining whether the evidence was sufficient to support a conviction involves interpreting the statute itself, that is a question of law which we review de novo. *See Woodard v. Commonwealth*, 287 Va. 276, 280 (2014).

Pittman was convicted of obtaining property by false pretenses, in violation of Code § 18.2-178, and conspiring with another to do the same, in violation of Code § 18.2-22. "Conspiracy requires a shared intent and joint action." *Charity v. Commonwealth*, 49 Va. App. 581, 585-86 (2007) (quoting *Hix v. Commonwealth*, 270 Va. 335, 347 (2005)). "Conspiracy requires . . . (1) an agreement between two or more persons, which constitutes the act; and (2) an intent thereby to achieve a certain objective[,] either an unlawful act or a lawful act by unlawful means." *Id.* at 586 (alterations in original) (quoting *Hix*, 270 Va. at 347). "[T]he crime of conspiracy is complete when the parties agree to commit an offense. . . . No overt act in furtherance of the underlying crime is necessary." *Id.* (quoting *Gray v. Commonwealth*, 260 Va. 675, 680 (2000)). "[A] conspiracy may be inferred by actions alone." *Id.* at 587. "A conspiracy may be proved by circumstantial evidence. Indeed, because of the very nature of the offense, it often may be established only by indirect and circumstantial evidence." *Id.* at 586 (quoting *Gray*, 260 Va. at 680) (cleaned up).

> [W]hen "it has been shown that the defendants 'by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment, the [fact-finder] will be justified in concluding that they were engaged in a conspiracy to effect that object.'"

*Id.* (quoting *Brown v. Commonwealth*, 10 Va. App. 73, 78 (1990)).

Pittman was charged with conspiring to obtain property by false pretenses in violation of Code § 18.2-178, which provides:

> If any person obtain, by any false pretense or token, from any person, with intent to defraud, money, a gift certificate or other property that may be the subject of larceny, he shall be deemed guilty of larceny thereof; or if he obtain, by any false pretense or token, with such intent, the signature of any person to a writing, the false making whereof would be forgery, he shall be guilty of a Class 4 felony.

- 14 -

Thus, in order to prove that a conspiracy existed in this case, the evidence must show that Pittman formed an agreement and possessed the requisite intent to obtain the property of another by false pretenses, with the intent to defraud. *See Charity*, 49 Va. App. at 586 ("[I]n order to prove that a conspiracy existed in this case, the evidence must show that appellant formed an agreement and possessed the requisite intent to [commit the underlying crime].").

Here, the evidence was sufficient for a reasonable fact-finder to find, beyond a reasonable doubt, that Pittman made an agreement and possessed the intent to obtain the two motorcycles by false pretenses. Davis, under the guise of a legitimate purchase, provided AAASC with a false identity and a stolen credit card number. After the payment was initially accepted, Davis left the store with the Tao Tao motorcycle. The next day, Clark received a tip from an unknown woman that the motorcycle sale was a scam. The woman sent Clark a video that depicted Pittman, sitting on top of the lime green Tao Tao motorcycle, bragging about committing felonies every day, and how he and his partner got away with it. Further, the video showed the U-Haul truck with the same red straps that Clark had helped Height use to securely strap the Tao Tao motorcycle with. Clark contacted the police. Upon being confronted by Sergeant Turner, Davis admitted, "I give up. You got me." Further, Davis admitted that "his boys" were coming to pick up the second motorcycle. Pittman was then spotted passing the store while driving the U-Haul truck. Clark informed Sergeant Turner that the driver of the U-Haul was the same individual depicted in the video (later identified as Pittman). Several days after the purported sale, the bank rescinded the transaction and reclaimed the purchase money for the sale of the two motorcycles.

The testimony from Clark and Sergeant Turner describing the video illustrates that: (1) this was another larceny committed in a string of "felonies" committed by Davis and Pittman, and (2) Pittman, far from being an innocent party in this scheme, had full knowledge of the plan to steal the motorcycles, and was an equal participant in the scheme.

- 15 -

We hold that a reasonable fact-finder could come to the conclusion, beyond a reasonable doubt, that Pittman had the intent to carry out a scheme with Davis to obtain the two motorcycles from AAASC by falsely representing that they intended to pay for them, when in fact, the identification presented by Davis was false, and the credit card was a fraudulent card with a stolen credit card number. The trial court was entitled to find that Pittman and Davis had conspired to deprive AAASC of the two motorcycles, based on: (1) Pittman's own statements in bragging about committing multiple felonies and getting away with them, (2) Pittman being shown in the video in possession of the Tao Tao motorcycle, which Davis had initially picked up from the store, (3) Pittman's own actions in driving the U-Haul by the store, initially signaling to turn into the store parking lot, and then driving away upon seeing police there, and (4) Davis's admission that Sergeant Turner had "got[ten]" him, combined with his statement that "his boys" were coming to pick up the second motorcycle from AAASC. Pittman's actions taken in accordance with Davis's plan show that he and Davis formed an agreement to commit the larceny. *See Charity*, 49 Va. App. at 586. Thus, the evidence was sufficient for the trial court to find, beyond a reasonable doubt, that the elements of conspiracy had been established.[4]

---

[4] Pittman argues that at most, the Commonwealth's evidence proved that he aided and abetted Davis in committing the larceny. *See Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988) ("[A] defendant may wittingly aid a criminal act and be liable as an aider and abettor, but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act." (quoting *United States v. Bright*, 630 F.2d 804, 813 (5th Cir. 1980))). "In order to establish the existence of a conspiracy, as opposed to mere aiding and abetting, the Commonwealth must prove 'the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting.'" *Id.* (quoting *United States v. Peterson*, 524 F.2d 167, 174 (4th Cir. 1975)). While this general rule is correct, here, the evidence was sufficient to show that Pittman and Davis had formed an agreement prior to the execution of the crime. This is illustrated both by Pittman's statements bragging about his and Davis's ability to get away with felonies every day in combination with being in possession of the recently stolen goods, as well as the fact that he sped away from the store upon observing a police cruiser, thus evincing his own guilty knowledge. *See Jones v. Commonwealth*, 279 Va. 52, 58 (2010) ("[A]cts of flight from a crime scene, or of deceitful behavior immediately following the commission of a crime, are acts that generally cannot be explained in terms of innocent human behavior. Thus, when a defendant affirmatively acts in such a manner, a court

Further, the evidence was sufficient to sustain the conviction for obtaining property by false pretenses. There are four elements that the Commonwealth must prove in order to sustain a conviction for larceny by false pretenses:

> (1) an intent to defraud; (2) an actual fraud; (3) use of false pretenses for the purpose of perpetrating the fraud; and (4) accomplishment of the fraud by means of the false pretenses used for the purpose, that is, the false pretenses to some degree must have induced the owner to part with his property.

*Bourgeois v. Commonwealth*, 217 Va. 268, 272 (1976).

Here, as discussed above, Pittman and Davis formed the intent to defraud AAASC of the two motorcycles. The fraud consisted of providing a fake identity and a stolen credit card number to Clark, the store manager of AAASC. Clark, believing the sale to be legitimate, conveyed the Tao Tao motorcycle to Davis. Pittman was shown to be in possession of the recently stolen motorcycle just a day later. The purchase money, however, was reclaimed by the bank two days after the sale. There can be no question that Pittman came into possession of the stolen motorcycle through his and Davis's fraudulent scheme.

For the foregoing reasons, the trial court did not err in finding Pittman guilty of both offenses beyond a reasonable doubt.

## III. CONCLUSION

The trial court did not err in admitting the testimony of Clark and Sergeant Turner related to the excluded video. Further, viewed in the light most favorable to the Commonwealth, the record contained sufficient evidence to convict Pittman of obtaining property by false pretenses and conspiring with another to do the same.

*Affirmed.*

may consider those acts in the context of all the facts presented as evidence tending to show the defendant's consciousness of guilt of the crime committed.").

- 17 -

Huff, J., dissenting.

Although testimony about the authenticated contents of a video may be allowed into evidence under certain circumstances, even without admitting the video itself, those circumstances were absent in the instant case; therefore, I respectfully dissent from the majority's opinion on this issue.

The Virginia Rules of Evidence set certain threshold requirements for the trial testimony at issue here. Among them, Rule 2:602 prohibits a witness from testifying about a matter unless he possesses "personal knowledge of the matter." Inextricably linked with that mandate is Rule 2:901's authenticity requirement for the admission of photographs and video evidence. The interplay of these rules governs the scope of a witness's testimony about the contents of a video recording.

As relevant to this case, a witness who has personal knowledge of the events captured in a video can both authenticate the recording pursuant to Rule 2:901 *and* testify to the witnessed contents under Rule 2:602, regardless of whether the video is ultimately offered into evidence.[5] But to find that a witness lacking such personal knowledge can still testify to the contents of an unauthenticated video simply because he happened to watch the video at some point in time is inconsistent with Virginia's evidentiary rules and related caselaw.

Pursuant to Rule 2:901, authentication is "a condition precedent to [the] admissibility" of evidence and is satisfied only by "evidence sufficient to support a finding that the thing in

---

[5] *See Williams v. Commonwealth*, No. 1557-14-1, slip op. at 5 (Va. Ct. App. Dec. 22, 2015) ("[A] witness may testify as to the contents of an *admissible* photograph or videotape, whether it is admitted or not." (emphasis added)). Unpublished opinions, although not binding, may be cited as "informative" and "considered for their persuasive value." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012); Rule 5A:1(f).

question is what its proponent claims." Va. R. Evid. 2:901.[6]  Regarding video recordings,

Virginia law recognizes only two ways in which a party may seek to authenticate and admit such

---

[6] This threshold authentication requirement is a gatekeeping mechanism designed to exclude unreliable evidence.  *See, e.g.*, *Canada v. Commonwealth*, 75 Va. App. 367, 377 n.4 (2022) ("The authentication inquiry is a narrow one and is only concerned with the genuineness of the offered evidence.").  An important distinction exists, however, between "authentication" and "admissibility."  The former "is a necessary but not a sufficient prerequisite to the admission of the evidence."  *Id.*; *see also Brooks v. Commonwealth*, 15 Va. App. 407, 410 (1992) (holding that the party offering the evidence must authenticate it before asking the court to admit it into evidence).  Once properly authenticated under Rule 2:901, the evidence may be admitted only if its proponent can show that it "complies with all of the other rules of evidence relating to relevance, hearsay, best evidence, etc."  *Canada*, 75 Va. App. at 377 n.4.  For instance, even authenticated evidence may nevertheless be deemed inadmissible if the trial court finds that its prejudicial effect outweighs any probative value.  *See, e.g.*, *Bailey v. Commonwealth*, 259 Va. 723, 739 (2000) (holding that the trial court did not abuse its discretion in admitting authenticated autopsy photographs where their relevance did not render them "unduly inflammatory"); *Brooks*, 15 Va. App. at 410 ("If the court determines that the information on the tape is relevant and that the probative value of its contents outweighs any prejudicial effect, it should be admitted [after authentication].").
Despite the majority's implication otherwise, those secondary evidentiary obstacles to admissibility have no bearing on the threshold issue of authentication.  *See, e.g.*, *Wells v. Commonwealth*, 65 Va. App. 722, 728 (2016) (holding that only after evidence is admitted does "its weight [become] a matter for the jury to determine" (quoting *Tipton v. Commonwealth*, 224 Va. 256, 261 (1982))).  Consequently, the majority's reliance on *Brown v. Commonwealth*, 54 Va. App. 107 (2009), and *McDaniel v. Commonwealth*, 73 Va. App. 299 (2021),—for the proposition that a witness can testify to unauthenticated evidence—is misplaced because the facts and legal issues raised in those cases are distinct from the issue of authenticity in appellant's case.
In *Brown*, the only objection defendant raised was that witness testimony about the contents of a video not in evidence violated the best evidence rule.  54 Va. App. at 113.  Finding that rule does not apply to videos, this Court allowed the witness's testimony.  *Id.*  That holding does not extend to primary challenges of authenticity, which were not raised in *Brown*.  Moreover, unlike in appellant's case, the Commonwealth in *Brown* could almost certainly have authenticated the video had that issue arisen.  At the very least, it laid a sufficient foundation for admission of the video as a silent witness because the asset protection security guard testified that he was familiar with the store's video surveillance system and that it recorded "things that are happening . . . at the time they are happening."  *Id.* at 111.  In contrast, the Commonwealth could not offer such evidence in appellant's case and the trial court explicitly rejected the attempt to introduce the video into evidence.
In *McDaniel*, this Court rejected as untimely defendant's challenge to the "accuracy of the photograph" used during testimony of an expert witness because the photo had previously been "admitted into evidence without objection" during the testimony of a different witness.  73 Va. App. at 315-16.  As a result, defendant's questions "concerning the photograph's accuracy were relevant only to the jury's assessment of the weight to give it."  *Id.* at 316.  That conclusion

evidence: "*either* to illustrate a witness's testimony *or* to serve as an 'independent silent witness' of matters depicted in the video." *Bennett v. Commonwealth*, 69 Va. App. 475, 487-88 (2018) (quoting *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000)).

Under the first method, a witness must attest that the contents of the video "fairly represent what that witness has observed." *Bailey*, 259 Va. at 738. In essence, this requirement renders the video a recorded version of the witness's own memory, thus allowing him to authenticate the footage as an accurate representation of reality regardless of whether he knows how or by whom the video was created. *See Bailey*, 259 Va. at 739[7]; *see also Tirado v. Commonwealth*, 296 Va. 15, 27 (2018) (finding detective's testimony "that the recording accurately depicted her interview with [defendant]" sufficient to satisfy Rule 2:901); *Alvarez Saucedo v. Commonwealth*, 71 Va. App. 31, 46-47 (2019) (finding video recording was authenticated by witness's testimony that it was a "true and accurate copy and depiction of [the] interview" she had conducted with the victim); *Wilson v. Commonwealth*, 29 Va. App. 236, 239 (1999) (finding video was authenticated by victim's testimony that "the tape accurately showed the assault on him as it was occurring" and thus "corroborated and portrayed graphically the victim's testimony").

In contrast, where "no person has witnessed the matters shown in the recording," the second method of admitting video as a "silent witness" relies on the testimony of its maker or

---

is inapplicable to the case here where appellant timely raised and preserved for appeal his objection to the witnesses' testimony about the unauthenticated contents of the video.

[7] In *Bailey*, the Supreme Court held that photographs introduced through witnesses who had not created them were nevertheless admissible because the Commonwealth established a proper foundation for their authenticity. 259 Va. at 739. There, the officers responsible for investigating a murder testified that the photos accurately depicted what they had personally observed at the scene of the crime despite the fact that they had not created those photographs. *Id.*; s*ee also Wilson v. Commonwealth*, 29 Va. App. 236, 239 (1999) ("Because a witness with knowledge testified that the videotape was what it claimed to be, the Commonwealth did not need to prove the accuracy of the process that produced it.").

custodian for authentication purposes. *Bennett*, 69 Va. App. at 488 n.7 (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 16-15, at 1155 (7th ed. 2012)). Such testimony must establish an "adequate foundation assuring the accuracy of the process producing" the recording. *Id.* (quoting *Brooks*, 15 Va. App. at 410); Kent Sinclair, *The Law of Evidence in Virginia* § 16-15, at 1222 (8th ed. 2018) (quoting *Ferguson v. Commonwealth*, 212 Va. 745, 746 (1972)).[8]

In the case at bar, the Commonwealth presented no evidence sufficient to authenticate the video under either method. Although Clark recognized the Tao Tao motorcycle, red ratchet straps, certificate of origin, and the bill of sale depicted in the video, he was unable to offer any information about the authenticity of the video's contents as a whole or any of the circumstances of its creation. Indeed, Clark admitted that he had no personal, firsthand knowledge of the events depicted in the video or of the recording process itself because he received the video from an anonymous source. And Sergeant Turner had even less information about the video because he first watched it on Clark's phone and never subsequently identified the original creator or sender.

As appellant aptly stated in his brief, neither witness could attest "that the video accurately reflected any events which actually occurred in the order or context that they appeared in the video." The video could not illustrate the witnesses' testimony because, without them

---

[8] Generally, to be admissible as a "silent witness," testimony is required from a witness that he or she is the owner or custodian of the recording device; they have personal knowledge of how the device works; the device was in proper working order on the date and time at which the proffered recording was filmed; and the recording was not subsequently altered in any way. *See, e.g.*, *Williams*, slip op. at 4-5 ("To the extent that the videotape was acting in part as a silent witness, [the store clerk] addressed the accuracy of the process in her testimony by noting the time and date stamps and the consistent passage of time" as well as "describ[ing] the taping procedures"); *Bennett*, 69 Va. App. at 481-82, 488 n.7; *Brooks*, 15 Va. App. at 410-11. As a result, the witness need not have any independent knowledge of the video's contents in order to authenticate it for use as a "silent witness."

- 21 -

watching the video, there would have been no testimony to offer about the recorded content.[9]

Nor could Clark or Turner "verify that the video captured live events which had not been pieced together, altered, or edited out of context."[10] As a result, the video could not be offered as a reliable "silent witness."[11] And the mere fact that items familiar to Clark were depicted in the

---

[9] Although Clark recognized several items in the video, the testimony about the contents of the video certainly was not offered for the purpose of describing what the motorcycle, straps or sales papers looked like. And the mere fact that the witnesses watched the video was not a sufficient foundation for the threshold issue of authenticity.

[10] The increasingly common use of evolving technology to create "deep fakes"—images, videos, audio, or other media that have been digitally altered to appear authentic—emphasizes the importance of strictly adhering to the authentication and personal knowledge requirements of Rules 2:901 and 2:602, respectively. *See* Molly Mullen, *A New Reality: Deepfake Tech. & the World Around Us*, 48 Mitchell Hamline L. Rev. 210, 211-12 (2022) (describing how, by digitally swapping "an image or likeness of one person's face . . . with another face or body," a deep fake creator can produce and manipulate content in which it "appear[s] as if the subject of the medium is speaking or partaking in an action that they did not actually undertake"); Bobby Chesney & Danielle Citron, *Deep Fakes: A Looming Challenge for Privacy, Democracy, & National Security*, 107 Calif. L. Rev. 1753, 1757-58 (2019) (referring to "deep fakes" "as shorthand for the full range of hyper-realistic" and hard to detect "digital falsification of images, video, and audio" through the alteration of existing media or invention of wholly new content); Riana Pfefferkorn, *"Deepfakes" in the Courtroom*, 29 B.U. Pub. Int. L.J. 245, 247, 249-50 (2020) ("[S]oftware programs for creating deepfakes . . . have been freely available online since at least 2017, and they're fairly easy for anyone to use," thus making it increasing difficult "for laypeople, as well as computer systems, to tell real from fake."); *Words We're Watching: 'Deepfake,'* Merriam Webster (Apr. 2020), https://www.merriam-webster.com/words-at-play/deepfake-slang-definition-examples [https://perma.cc/BER4-E8JN].

[11] The majority cites to *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990), for the proposition that "[w]here there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." The evidence at issue in that case, however, makes *Reedy* inapplicable to the case at hand. There, the court's analysis centered on physical evidence—an ambulance stretcher and a shirt—that appellant alleged could have been contaminated. The Court's conclusion, however, that "the trial judge did not abuse his discretion in admitting the evidence" was based on an initial finding that "the chain of custody was proven" and thus there was no gap in the evidence. *Id.*; *cf. Robinson v. Commonwealth*, 212 Va. 136, 138 (1971) (finding physical evidence inadmissible where "some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received" and thus the party offering the evidence did not meet its burden "to show with reasonable certainty that there ha[d] been no alteration or substitution of it").

video is insufficient to support a finding of authenticity under the circumstances here.[12]  Absent

evidence about its source, production, and accuracy, the video remained unauthenticated, thus

disqualifying it and its contents from evidence.

Despite excluding the video from evidence due to lack of authentication, the trial court

nevertheless allowed both Clark and Turner to describe in detail what they recalled seeing in the

video when they watched it.  I find those conflicting rulings irreconcilable under proper

application of Rules 2:901 and 2:602.  Merely viewing a video sent by an unknown source does

not give Clark and Turner "personal knowledge" of the matters captured in that video, which is

necessary under the requirements of both sets of rules.

Furthermore, the trial court's ruling on the authenticity of the video itself is not before us

because neither party appealed the trial court's exclusion of that evidence.  Under the law of the

case doctrine, our Court must accept the trial court's unchallenged judgment that the witnesses'

testimony was insufficient to authenticate the video under Rule 2:901.[13]  Accordingly, because

Here, unlike in *Reedy*, the Commonwealth could not satisfy the initial authentication threshold for the offered evidence.  As a result, the authenticity of the video itself was mere speculation insufficient to satisfy Rule 2:901.

[12] The majority reasons that "the trial court did not err in admitting the limited testimony about the video" because Clark's testimony contained "sufficient indicia of reliability to prove the relevance and probative value of his testimony and that of Sergeant Turner regarding specific portions of the video."  I disagree that Clark's ability to recognize certain physical items portrayed in the video constitutes "sufficient indicia of reliability" considering his lack of knowledge about the source and production of the video as a whole.  And if a witness can bootstrap the admissibility of such evidence based only on testimony about its unauthenticated contents, then Rules 2:602 and 2:901 no longer prevent a witness from testifying to matters of which he has no personal knowledge.

[13] The majority's opinion that "the trial court *could* have admitted the video"—because "Clark's testimony regarding specific portions of the video provided a sufficient basis to meet the 'threshold' authentication requirements of Rule 2:901"—therefore contradicts both our caselaw and procedural principles.  *See Stacey v. Commonwealth*, 73 Va. App. 85, 94 (2021) ("Under this [law of the case] doctrine, 'when a party fails to challenge a decision rendered by a court at one stage of litigation, that party is deemed to have waived her right to challenge that decision during later stages of the "same litigation"'" (quoting *Miller-Jenkins v. Miller-Jenkins*,

admission of the video itself was properly barred by Rule 2:901, I would hold that the testimony about the video's unauthenticated contents should likewise have been precluded by Rule 2:602 for exceeding the bounds of the witnesses' personal knowledge.[14]

The majority's conclusion to the contrary appears to adopt the Commonwealth's argument that a person's ability to observe a photograph or video recording in a vacuum satisfies the "personal knowledge" restriction of Rule 2:602 even when it is insufficient to authenticate the evidence under Rule 2:901. But I find no justification for attributing "personal knowledge" of a video's contents to any person who happens to view the video—whether on television, on the internet, or on a cell phone—when they would otherwise have no independent knowledge of the depicted events but for having watched someone else's recording.[15] And such an expanded definition of "personal knowledge" cannot be harmonized with the underlying objective of excluding unreliable evidence from trial. Instead, it renders the witness a mere conduit for admitting otherwise inadmissible evidence—an unsanctioned workaround to Rule 2:901.

---

276 Va. 19, 26 (2008)); *Kondaurov v. Kerdasha*, 271 Va. 646, 658 (2006) (holding that a jury instruction "given without objection . . . becomes the law of the case, governing all subsequent proceedings[,]" and "will not be disturbed on appeal"); *Cromartie v. Billings*, 298 Va. 284, 306 (2020) (holding that the jury's legal decisions "became the law of the case and govern[ed] all subsequent proceedings, including this appeal and any matters on remand" where the verdicts were not challenged).

[14] The majority cites *Nottingham v. Commonwealth*, 73 Va. App. 221 (2021), as support for its claim that Clark and Turner could testify about what they observed in the video because trial judges are permitted to admit "only certain parts or aspects of a particular piece of evidence but not the whole thing." In *Nottingham*, this Court permitted a detective to testify about the victim's demeanor during the interview he had conducted, despite having excluded the video depicting that interview because it contained unredacted hearsay statements. Those two rulings, unlike the ones at issue in appellant's case, are not incompatible because the detective's personal recollection of the interview was not dependent on the video recording. Conversely, neither Clark nor Turner had personal knowledge of the events depicted in the video here that would provide an independent basis for their testimony about it.

[15] *See, e.g., Wilson*, 29 Va. App. at 239 (finding that merely watching a video does not confer "personal, direct knowledge of the facts occurring and the scene captured on the tape").

The trial court's admission of testimony about the contents of an unauthenticated video from an unknown source amounted to an error of law and constitutes an abuse of discretion. *See Bennett*, 69 Va. App. at 485.[16] Furthermore, the admission of incriminating testimony about the contents of the unauthenticated video was not harmless error because appellant's convictions cannot stand in the absence of that evidence.[17] As the trial court itself candidly acknowledged, that testimony became the lynch pin connecting the properly admitted factual testimony to the theory of the Commonwealth's case, without which "there would be no way to establish [appellant] had the guilty knowledge" necessary to prove each offense.

For these reasons, I would reverse the trial court on this one issue and remand for a new trial if the Commonwealth be so inclined. I therefore respectfully dissent from the majority's opinion.

---

[16] Admissibility of evidence is governed by an abuse of discretion standard of review. *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006). An error of law, by definition, constitutes an abuse of discretion. *Bass v. Commonwealth*, 31 Va. App. 373, 382 (2000). In this case, the threshold requirements of Virginia law were lacking.

[17] Code § 8.01-678 sets the standard by which this Court "reviews a decision to admit or exclude evidence" for non-constitutional harmless error. *Haas v. Commonwealth*, 299 Va. 465, 467 (2021); *see also Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016) (applying Code § 8.01-678 in both criminal and civil cases). "Under that standard, the court 'determine[s] whether there has been a fair trial on the merits and whether substantial justice has been reached [by] decid[ing] whether the alleged error substantially influenced the [factfinder]." *Haas*, 299 Va. at 467 (first through third alterations in original) (quoting *Clay v. Commonwealth*, 262 Va. 253, 259 (2001)). Such error is only harmless "if other evidence of guilt is so 'overwhelming' and the error so insignificant by comparison that we can conclude that error 'failed to have any "substantial influence" on the verdict.'" *Holmes v. Commonwealth*, 76 Va. App. 34, 59 (2022) (quoting *Dandridge v. Commonwealth*, 72 Va. App. 669, 685 (2021)); *see also* Code § 8.01-678.