COURT OF APPEALS OF VIRGINIA

Present:    Judges Huff,[*] AtLee and Ortiz
Argued by videoconference

DAVID JASANTE CUNNINGHAM

MEMORANDUM OPINION[**] BY
v.       Record No. 1140-23-4                JUDGE GLEN A. HUFF
                                             FEBRUARY 25, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Kathleen M. Uston, Judge

Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent
Defense Commission, on briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following trial in the Circuit Court of the City of Alexandria (the "trial court"), a jury

convicted David Jasante Cunningham ("appellant") of aggravated murder and two counts of

object sexual penetration.  On appeal, appellant argues that the trial court erred by denying his

motion to suppress statements he made to the police, by admitting certain evidence at trial, and

that the evidence was insufficient to support one of his object sexual penetration convictions.

Finding no error, this Court affirms the convictions.

---

[*] Judge Huff prepared and the Court adopted the opinion in this case prior to the effective date of his retirement on December 31, 2024.

[**] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

M.J., who was born with Down syndrome, was 23 years old in December 2021 and lived alone in an Alexandria apartment. She texted her stepmother each morning to confirm that she had showered, shaved, and brushed her teeth. She last texted her stepmother on the morning of December 4, 2021.

On December 7, 2021, after not hearing from M.J. for several days, her stepmother and father went to her apartment because they were concerned by her lack of communication. When they arrived, they discovered the apartment had been "ransacked"; chairs were knocked over, pillows were not on the sofa, and DVDs were strewn on the floor. They found M.J. lying face down on the bedroom floor with a blanket and plastic bag over her head, and a shirt and bra wrapped around her neck. Her father rolled her over, removed the blanket, and confirmed she was dead. Her stepmother called 911. When first responders arrived, M.J. was lying on the bedroom floor, partially nude, with a plastic bag near her head. A paramedic determined she had been dead "for some time."

While investigating the scene, officers found a pair of red-stained scissors under her bed and crumpled aluminum foil with red stains near M.J.'s body. Several officers confirmed that there were no signs of forced entry to the apartment, but many items in the apartment were misplaced and "the apartment looked like it had been ransacked." Detective Bikeramjit Gill recovered a plastic cap from the dresser that he determined belonged to a Lysol container, but he could not find the corresponding Lysol container and no other item was on the dresser.

---

[1] On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires this Court to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

On December 8, 2021, Drs. Audrea Williams and Gene Maya examined M.J.'s body and performed an autopsy. Williams determined M.J. had died of "[a]sphyxia including ligature strangulation" at least 36 hours before the autopsy. The autopsy revealed three lacerations to M.J.'s vaginal wall and "bloody fluid" between her legs but no "evidence of acute trauma or injury" to her anus. Sara Jennings, a forensic nursing expert specializing in sexual assault, testified that M.J.'s injuries were "consistent with sexual assault," noting that while she did not observe any injuries to M.J.'s anus "about 95 percent" of patients who report sexual abuse exhibit no injuries. As part of her examination, Williams swabbed M.J.'s anorectal cavity.[2] Maya testified that an anorectal swab is four swabs inserted "into the rectum and kind of twisted all inside the rectum." Williams and Maya also clipped M.J.'s fingernails and swabbed her oral and vaginal cavities, neck, and hands.

In addition to the medical findings, the autopsy report included a case summary stating, "[p]er investigation, this 23-year-old woman with a history of Down syndrome was found unresponsive, nude, and prone on the floor of her residence wrapped in a blanket with a plastic bag over her head. The residence was reported to be in disarray and locked without the chain lock engaged." Appellant objected to admission of the report on the ground that the case summary was hearsay. The trial court admitted the report, only redacting "and locked without the chain lock engaged."

On December 7, 2021, M.J.'s father saw appellant twice: once while walking past M.J.'s apartment and later near the leasing office. A detective also saw appellant walk past M.J.'s apartment several times during the investigation. During their investigation, the police canvassed the nearby apartments that day to collect information; during this process they spoke

---

[2] Per Williams, the anorectal cavity is "the external portion of the anus as well as the internal portion" and inside the rectum but "not that far in" the rectum.

with appellant, who lived on the same floor as M.J. but he denied knowing her. The next day, when questioned by a different officer, appellant admitted he had known M.J. for several months and they used to "hang out." He said that he had seen her on December 2 or 3 inside her apartment and that "things were flirty, but nothing sexual happened." He had also seen her outside later that day.

The apartment building had continuously-recording surveillance cameras, including one by the first-floor elevator and one by the leasing office. The building management company retained any motion-activated footage "in the normal course of business." Twelve employees, including the assistant property manager, Karianne Wiley, could view and copy the footage with time stamps from a computer in the office. Wiley downloaded the surveillance footage from December 3, 4, and 7, 2021, and provided those videos to the police. She confirmed that the Commonwealth's exhibits were fair and accurate copies of the videos she provided to the police.

These cameras were installed and maintained by a separate company from the apartment complex. That company's employees could access the surveillance footage from the apartment office but could not do so remotely. When asked how sensitive the motion activation was, the type of software used, how long the system retained the footage, or how often the system was updated, Wiley answered that she did not "know the exact details." Appellant objected to the videos being admitted, claiming the Commonwealth had failed to authenticate them. The trial court admitted the videos over appellant's objection.

One video showed M.J. in the parking lot on December 3, 2021, while appellant stood nearby and watched her for several minutes. He briefly left the area but returned and spoke to M.J. before she went inside. Another video showed appellant enter the first-floor elevator wearing a work vest just after 11:00 a.m. on December 4, 2021. At 1:13 p.m. that same day, appellant exited the elevator wearing different clothes and black and white sandals. Just before

4:00 p.m., he exited the elevator, again wearing different clothes. The final video showed appellant inside the leasing office on December 4, 2021. A leasing consultant confirmed that appellant had come to the office that day.

The apartment building was only accessible by call box or a key fob the building provided its residents. Wiley testified that a computer system recorded each time a resident used their key fob, and the management company kept those records "in the normal course of business." Appellant objected to the key fob records, arguing the Commonwealth had not laid the foundation to establish how the records were collected, stored, accessed, or modified. The trial court overruled appellant's objection, finding "that the business records exception has been met." The records showed M.J. had last used her key fob in the evening of December 3, 2021, and appellant entered the building at 11:13 a.m. and 3:04 p.m. on December 4, 2021.

Police obtained a search warrant for appellant's apartment, DNA, and fingerprints. In the early morning on January 11, 2022, Detective Michael Whelan and a SWAT team entered appellant's apartment, woke him up, handcuffed him, and transported him to the police department. Whelan and Gill took appellant to a "soft" interview room, where they removed his handcuffs, allowed him to use the restroom, and collected his DNA and fingerprints.

Whelan initially told appellant that he was not under arrest and was being questioned as part of "an exploratory investigative process" for the crime of murder. He then read appellant *Miranda*[3] warnings from the Alexandria Police Department's standard waiver form and asked appellant after each right if he understood. Appellant confirmed his understanding and signed the form. At the time, appellant was 40 years old, had completed high school and some college, and had past experience with the criminal justice system. He told the detectives that he was addicted to drugs and had last used about a week before.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Appellant stated he had last seen M.J. outside her apartment building the week she died. He also admitted to being inside M.J.'s apartment that same week but could not remember whether it was December 2 or 3. He acknowledged he was a "little flirtatious" with M.J. but "nothing too crazy." Initially, he denied doing anything "sexual" inside M.J.'s apartment but soon admitted to inserting his finger into her vagina.

Throughout the interview, the detectives claimed to have forensic evidence that had not yet been confirmed. For example, Whelan told appellant that his fingerprints had been found on various items inside M.J.'s apartment, including a Lysol cap, tinfoil, a bag, a soap dispenser, and some DVDs. The detectives also told appellant that his DNA was on M.J.'s body.

At one point, appellant asked whether the detectives were trying to trick him because they had collected his fingerprints only at the start of the questioning. He mostly claimed he did not remember whether he had touched any items inside the apartment. He denied using Lysol to clean anything. But his story shifted during the interrogation. For example, when asked why his DNA would be on M.J.'s body, he admitted for the first time that he had "grinded" his penis on her. He also claimed that she bled on his hand when he put his finger into her vagina.

Nearly three hours into the interrogation, appellant repeatedly began to ask if he could call his mother; the detectives told him that he could do so once they finished questioning him. Whelan reiterated several times during the questioning that appellant's *Miranda* rights remained in force, to which he responded, "I get that." The detectives permitted appellant several breaks to use the restroom or smoke. When they asked him whether they had treated him with respect, he responded "100%." After about three hours, the detectives told appellant that they were going to arrest him for murder. Finally, after about four and a half hours, he asked to speak to a lawyer. Notwithstanding this request, appellant continued to answer the detectives' questions for some time.

Appellant moved to suppress his statements, arguing that his *Miranda* waiver was not knowing, intelligent, and voluntary. His statements were involuntary, he argued, because the detectives overbore his will; and the detectives did not stop questioning him after he requested an attorney. The trial court granted in part appellant's motion for the statements he made after he asked to speak to a lawyer but denied in part the motion as to his statements before that.

The police matched a fingerprint on the Lysol cap to appellant but found no other fingerprints from the scene that were suitable for comparison. There was a mixed DNA profile on the scissors. Neither M.J. nor appellant could be eliminated as contributors to that mixed sample. The chance of the sample matching appellant was 1.5 trillion times more probable than a random match of an unrelated African American. Appellant also could not be eliminated as a contributor to DNA profiles developed from M.J.'s anorectal sample, left-hand fingernail clippings, left hand swabs, and anterior neck sample. The probability of a random match among the African American population was 1 in 87 for the anorectal sample and 1 in 2,300 for the other three samples. The police recovered black and white sandals with blood on them from appellant's apartment. M.J. could not be eliminated as a contributor of that blood, with the chance of a random match being 1 in greater than 7.2 billion.

The DNA sample from M.J.'s anorectal swab showed results suitable for comparison at 4 of the 17 loci. Dr. Daniele Podini, an expert in molecular biology and DNA analysis, testified as part of appellant's case in chief that "the lower the amount of DNA and the lower the quality of that DNA, the lower is the number of regions that" can be detected. But she also testified that "four loci are sufficient for a comparison."

The jury convicted appellant of murder and two counts of object sexual penetration. The trial court sentenced him to three consecutive life sentences plus three years' imprisonment with three years suspended.

This appeal followed.

ANALYSIS

I. Appellant's incriminating statements

Appellant first contends that "[t]he trial court erred by denying [his] pretrial motion to suppress where [his] post-*Miranda* statements were not voluntary under the Fourteenth Amendment." When a trial court denies a suppression motion, the "appellant bears the burden of establishing that reversible error occurred." *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 474 (2020)). "When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial." *Tirado v. Commonwealth*, 296 Va. 15, 24 (2018) (quoting *Commonwealth v. White*, 293 Va. 411, 414 (2017)).

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, if a suspect is coerced into making a statement involuntarily, the prosecution may not use that statement against him at trial. *See Avent v. Commonwealth*, 279 Va. 175, 195 (2010) ("If the suspect's will has been overborne and his capacity for self-determination critically impaired, the confession is considered involuntary and its use is unconstitutional." (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995))). An incriminating statement is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" and involuntary if "the maker's will has been overborne and his capacity for self-determination critically impaired." *Tirado*, 296 Va. at 28 (quoting *Gray v. Commonwealth*, 233

- 8 -

Va. 313, 324 (1987)). "[V]oluntariness is a question of law, subject to independent appellate review." *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (quoting *Avent*, 279 Va. at 195). "Subsidiary factual questions, however, are entitled to a presumption of correctness." *Id.*

This Court assesses voluntariness by examining "the totality of the circumstances," including "'the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview.'" *Thomas v. Commonwealth*, 72 Va. App. 560, 582 (2020) (quoting *Keepers v. Commonwealth*, 72 Va. App. 17, 41 (2020)). "[E]vidence of coercive police activity 'is a necessary predicate to the finding that a confession is not "voluntary."'" *Washington v. Commonwealth*, 43 Va. App. 291, 303 (2004) (alteration in original) (quoting *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992)).

Appellant argues that his statements were involuntary because Whelan and Gill would not let him talk to his mother during the interrogation and deceived him by exaggerating the strength of their evidence. Importantly, he does not argue that the *Miranda* waiver he made at the beginning of the interrogation was invalid, but rather only that his later statements were involuntary due to Whelan and Gill's post-waiver conduct. Yet appellant appears to argue that *all* of his statements were involuntary without identifying exactly when the detectives' conduct overbore his will. That argument is fundamentally flawed. Although, for example, appellant highlights the detectives' refusal to allow him to speak to his mother, he did not make that request until nearly three hours into the interview. He had already made several incriminating admissions before the detectives rebuffed his request, and he does not identify any incriminating admissions he made afterward.

Regardless, the record makes clear that all of appellant's statements were voluntary. In *Robinson v. Commonwealth*, 63 Va. App. 302 (2014), the police interrogated a 15-year-old suspect,

refused his repeated requests to call his mother, and falsely told him that he would necessarily be tried as an adult. *Id.* at 308. This Court held that the suspect's confession was voluntary nonetheless because the police gave him *Miranda* warnings, interrogated him without restraints, and let him use the restroom, while the suspect "gave no indication of being under the influence of drugs" and responded to the detectives' questions. *Id.* at 313-14.

The *Robinson* analysis applies equally to the circumstances here. Whelan read appellant his *Miranda* warnings and even reiterated throughout the interview that they applied. Appellant was questioned without handcuffs and allowed several breaks to use the restroom or smoke. Although appellant explained that he was addicted to drugs, he did not appear to be under the influence during the interview, told the detectives he had last used about a week before, and cogently answered the detectives' questions. Finally, appellant confirmed more than three hours into the interview that he understood his rights and that they still applied.

These circumstances differ substantially from the circumstances in *Peterson*, 15 Va. App. 486, on which appellant's argument relies. In *Peterson*, the police interrogated the suspect in an ambulance en route to the hospital after he had been injured and was actively experiencing the effects of recently-ingested cocaine. *Id.* at 488. During that interrogation he "was in pain, his vision blurred, and he was unable to understand 'everything that was going on around' him," making his statements involuntary. *Id.* Here, by contrast, appellant was lucid, uninjured, did not appear to be intoxicated, and agreed that the detectives had been respectful to him.

Here, the detectives did not overbear appellant's will by exaggerating the strength of the evidence against him. Although "'[a] deliberate falsehood by a police officer in the course of his duties' is not condoned, it will not render a confession involuntary unless it 'impede[s the defendant's] . . . "ability to understand the nature of his rights and the consequences of abandoning them."'" *Robinson*, 63 Va. App. at 312 (alterations in original) (quoting *Wilson v. Commonwealth*,

13 Va. App. 549, 554 (1992)); *see also Frazier v. Cupp*, 394 U.S. 731, 740 (1969) (finding a confession voluntary even though the police lied to a suspect that his co-defendant had confessed).

Appellant fails to cite a single Virginia case holding that the police overbore a suspect's will by distorting the evidence during questioning. Indeed, many cases have held otherwise. *See, e.g.*, *Arthur v. Commonwealth*, 24 Va. App. 102, 105, 107-08 (1997) (holding statements voluntary despite the police showing the defendant "dummy" laboratory reports containing fabricated fingerprint and DNA evidence); *Novak v. Commonwealth*, 20 Va. App. 373, 380, 387-88 (1995) (holding statements voluntary notwithstanding that the police lied that the defendant's fingerprints were found on the victim's clothes); *Wilson*, 13 Va. App. at 552-55 (holding statements voluntary although the police falsely stated the victim had identified the defendant). Appellant stresses the persuasive impact of DNA and fingerprint evidence, but this Court's precedents establish that the police can lie about possessing such evidence without rendering the suspect's confession involuntary. Moreover, appellant astutely challenged the detectives' claims when he observed that they had only taken his fingerprints at the beginning of the interview.

Finally, nothing in appellant's background or characteristics made him particularly susceptible to police coercion. He was 40 years old, had completed high school and some college, and there was no evidence of any intellectual difficulties. He also had prior experience with the criminal justice system. *See Midkiff*, 250 Va. at 269 (finding confession to be voluntary because the defendant was "no stranger to the criminal justice system" and had "experienced several prior police interrogations"); *Washington*, 43 Va. App. at 304 (stating that the defendant "was well experienced in dealing with the police, having previously been convicted of three felonies"). Accordingly, the trial court's denial of the motion to suppress the post-*Miranda* statements is affirmed.

II.  The trial court's evidentiary rulings

Appellant next assigns error to the trial court's admission of the autopsy report which allegedly contained hearsay, and the surveillance footage and key fob logs for allegedly lacking adequate foundation.  "It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'"  *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (alteration in original) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)).  "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred."  *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

A.  The autopsy report

Appellant argues that the trial court abused its discretion in admitting the autopsy report, which he asserts contained inadmissible hearsay.  Code § 8.01-678 requires harmless error review in all cases.[4]  *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022).  Non-constitutional error is harmless if this Court determines that "there has been a fair trial on the merits and . . . substantial justice has been reached" because "the alleged error [did not] substantially influence[] the" fact finder.  *Id.* at 217 (quoting *Haas v. Commonwealth*, 299 Va. 465, 467 (2021)).  An error is harmless "'if other evidence of guilt is so "overwhelming" and the error so insignificant by comparison.'"  *Dalton v. Commonwealth*, 64 Va. App. 512, 520-21 (2015) (quoting *Schwartz v. Schwartz*, 46 Va. App. 145, 159 (2005)).

---

[4] Code § 8.01-678 provides:

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any other defect, imperfection, or omission in the record, or for any error committed on the trial.

The unredacted portion of the autopsy report's case summary stated, "[p]er investigation, this 23-year-old woman with a history of Down syndrome was found unresponsive, nude, and prone on the floor of her residence wrapped in a blanket with a plastic bag over her head. The residence was reported to be in disarray." Assuming without deciding the summary was inadmissible hearsay, many eyewitnesses corroborated the information reported and none of the underlying facts were in genuine dispute.

Four witnesses, including M.J.'s parents and teachers, testified that she had Down syndrome. M.J.'s father testified that he found her unresponsive wrapped in a blanket with a plastic bag over her head. Other witnesses, including the first responders, testified that M.J. was unresponsive, nude, and had a plastic bag near her head when they arrived. Many witnesses testified that the apartment had been "ransacked" or was otherwise in disarray. Indeed, the Commonwealth submitted photographs showing the condition of both M.J. and her apartment at the time she was discovered. Importantly, no eyewitness testimony contradicted the autopsy report's case summary. Considering the multiple alternative sources of evidence—none of which implicated appellant—this Court concludes that the admission of the autopsy report's case summary was harmless if error.

### B. The surveillance footage

Next, appellant argues that the trial court erred by admitting the surveillance videos because the Commonwealth failed to lay the proper foundation for their admission. "A proper foundation must be laid for the introduction of all evidence." *Church v. Commonwealth*, 71 Va. App. 107, 124 (2019) (quoting *Sabo v. Commonwealth*, 38 Va. App. 63, 79 (2002)). Video footage is admissible either "to illustrate a witness' testimony" or "as an 'independent silent witness.'" *Bennett v. Commonwealth*, 69 Va. App. 475, 487 (2018). A party seeking to admit video evidence as a silent witness "must furnish 'an adequate foundation assuring the accuracy

of the process producing'" the video. *Id.* at 488 n.7 (quoting *Brooks v. Commonwealth*, 15 Va. App. 407, 410 (1992)). Admitting a video as a silent witness typically requires its maker to authenticate it. *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000). Authentication "is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901.

Appellant argues the Commonwealth failed to prove the accuracy of the video footage because Wiley did not know the details of the recording process, which was known only to other witnesses who also had access to the software. This Court disagrees. Wiley downloaded the surveillance footage from the computer system and transferred it to a flash drive, which she provided to the police. Her testimony established that the videos were what the Commonwealth claimed they were: footage from the apartment building's security camera system. That testimony satisfied Virginia Rule of Evidence 2:901's authentication requirement.

Other evidence in the record supports the authenticity of the footage. For example, just as depicted in the surveillance footage, appellant told the police that he saw M.J. in the parking lot on December 2 or 3, 2021. Details such as how often the software was updated or how long the footage was retained in the system are not relevant to the accuracy of the footage itself.

The party offering the evidence bears the burden "to show with reasonable certainty that there has been no alteration or substitution of it." *Church*, 71 Va. App. at 124. But "[w]here there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990). That is, the mere fact that others had access to the camera system—absent any evidence that anyone altered or tampered with the surveillance footage—went only to the *weight* of the evidence, not its *admissibility*. Accordingly, the trial court did not abuse its discretion in admitting the surveillance videos.

## C. The key fob records

Finally, appellant contends the trial court erred in admitting the key fob records. He argues the key fob records are not business records under Virginia Rule of Evidence 2:803(6) because those records reflect the residents', not the business's, regularly conducted activity.

"Hearsay is inadmissible unless permitted by an exception, and the party offering the evidence must 'clearly show' that the exception applies." *Khine v. Commonwealth*, 75 Va. App. 435, 444-45 (2022) (quoting *Clay v. Commonwealth*, 33 Va. App. 96, 104 (2000) (en banc), *aff'd*, 262 Va. 253 (2001)); *see also* Va. R. Evid. 2:802 ("Hearsay is not admissible except as provided by these Rules, other Rules of the Supreme Court of Virginia, or by Virginia statutes or case law."). Rule 2:803(6) provides one such exception to the general rule against hearsay for records of a regularly conducted business activity, known as the "business records exception." Business records are admissible under Rule 2:803(6) if:

> (A) the record was made at or near the time of the acts, events, calculations, or conditions by—or from information transmitted by—someone with knowledge;
> (B) the record was made and kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making and keeping the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 2:902(6) or with a statute permitting certification; and
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Va. R. Evid. 2:803(6).

Appellant cabins his challenge to the key fob records to Rule 2:803(6)(B) by arguing the key fob records do not record the apartment's regularly conducted activity but rather the activity of the apartment's residents. At trial, Wiley testified that the apartment complex's buildings were only accessed through a "fob or call box" and that each resident was provided a key fob.

She further testified that the key fob usage was continuously recorded and maintained by the apartment complex. Based on this testimony the trial court found that "the business records exception has been met" and admitted the key fob records. Accordingly, this record reflects that the key fob records indicated which residents were accessing the apartment complex and when. Insofar as the key fob records reflect the residents' regular activity, they also reflect the controlled access to the apartment complex itself by controlling and logging such access within the "regularly conducted activity of" the apartment. Accordingly, this Court cannot say the trial court abused its discretion in admitting the key fob records, and therefore the trial court's judgment as to the key fob records is affirmed.

### III. Sufficiency of the evidence

Finally, appellant alleges that the trial court erred in denying his motion to strike one count of sexual object penetration where the evidence was insufficient to establish penetration of the anus. "When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret*, 296 Va. at 228 (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v.*

- 16 -

*Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Here, appellant argues that the evidence underlying one of his object sexual penetration convictions was insufficient because the Commonwealth failed to prove that he penetrated M.J.'s anus.[5] A person is guilty of object sexual penetration if he "penetrates the [victim's] labia majora or anus." Code § 18.2-67.2. "[P]enetration 'need be only slight'" and "may be proved by circumstantial evidence." *Jett v. Commonwealth*, 29 Va. App. 190, 194 (1999) (first quoting *Horton v. Commonwealth*, 255 Va. 606, 612 (1998); and then quoting *Morrison v. Commonwealth*, 10 Va. App. 300, 301 (1990)).

At trial, the Commonwealth presented sufficient evidence for a reasonable jury to conclude that appellant penetrated M.J.'s anus. The anorectal swab contained a DNA profile from which appellant could not be eliminated as a contributor. Williams testified she swabbed the external and internal portions of M.J.'s anus. Maya testified that an anorectal swab includes four swabs "inserted into the rectum." Although there was no observed injury to M.J.'s anus, the Commonwealth's expert witness testified that most sexual assault victims exhibit no injuries. On that evidence, the jury's conclusion that appellant penetrated M.J.'s anus was not plainly wrong or without evidence to support it.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[5] Appellant does not challenge the evidence underlying that conviction on any other grounds, nor does he challenge the evidence underlying his other convictions.